## ERIE RAILROAD CO. *v.* TOMPKINS.

No. 367. Argued January 31, 1938.—Decided April 25, 1938.

*Mr. Theodore Kiendl,* with whom *Messrs. William C. Cannon* and *Harold W. Bissell* were on the brief, for petitioner.

68

*Mr. Fred H. Rees,* with whom *Messrs. Alexander L. Strouse* and *William Walsh* were on the brief, for respondent.

.Mr. Justice Brandeis delivered the opinion of the Court.

The question for decision is whether the oft-challenged doctrine of *Swift* v. *Tyson*[1] shall now be disapproved.

Tompkins, a citizen of Pennsylvania, was injured on a dark night by a passing freight train of the Erie Railroad Company while walking along its right of way at Hughestown in that State. He claimed that the accident occurred through negligence in the operation, or maintenance, of the train; that he was rightfully on the premises as licensee because on a commonly used beaten footpath which ran for a short distance alongside the tracks; and that he was struck by something which looked like a door projecting from one of the moving cars. To enforce that claim he brought an action in the federal court for southern New York, which had jurisdiction because the company is a corporation of that State. It denied liability; and the case was tried by a jury.

---

[1] 16 Pet. 1 (1842). Leading cases applying the doctrine are collected in *Black & White Taxicab Co.* v. *Brown & Yellow Taxicab Co.*, 276 U. S. 518, 530, 531. Dissent from its application or extension was expressed as early as 1845 by Mr. Justice McKinley (and Mr. Chief Justice Taney) in *Lane* v. *Vick*, 3 How. 464, 477. Dissenting opinions were also written by Mr. Justice Daniel in *Rowan* v. *Runnels*, 5 How. 134, 140; by Mr. Justice Nelson in *Williamson* v. *Berry*, 8 How. 495, 550, 558; by Mr. Justice Campbell in *Pease* v. *Peck*, 18 How. 595, 599, 600; and by Mr. Justice Miller in *Gelpcke* v. *City of Dubuque*, 1 Wall. 175, 207, and *Butz* v. *City of Muscatine*, 8 Wall. 575, 585. Vigorous attack upon the entire doctrine was made by Mr. Justice Field in *Baltimore & Ohio R. Co.* v. *Baugh*, 149 U. S. 368, 390, and by Mr. Justice Holmes in *Kuhn* v. *Fairmont Coal Co.*, 215 U. S. 349, 370, and in the *Taxicab* case, 276 U. S. at 532.

The Erie insisted that its duty to Tompkins was no greater than that owed to a trespasser. It contended, among other things, that its duty to Tompkins, and hence its liability, should be determined in accordance with the Pennsylvania law; that under the law of Pennsylvania, as declared by its highest court, persons who use pathways along the railroad right of way—that is a longitudinal pathway as distinguished from a crossing—are to be deemed trespassers; and that the railroad is not liable for injuries to undiscovered trespassers resulting from its negligence, unless it be wanton or wilful. Tompkins denied that any such rule had been established by the decisions of the Pennsylvania courts; and contended that, since there was no statute of the State on the subject, the railroad's duty and liability is to be determined in federal courts as a matter of general law.

The trial judge refused to rule that the applicable law precluded recovery. The jury brought in a verdict of $30,000; and the judgment entered thereon was affirmed by the Circuit Court of Appeals, which held, 90 F. 2d 603, 604, that it was unnecessary to consider whether the law of Pennsylvania was, as contended, because the question was one not of local, but of general, law and that "upon questions of general law the federal courts are free, in the absence of a local statute, to exercise their independent judgment as to what the law is; and it is well settled that the question of the responsibility of a railroad for injuries caused by its servants is one of general law. . . . Where the public has made open and notorious use of a railroad right of way for a long period of time and without objection, the company owes to persons on such permissive pathway a duty of care in the operation of its trains. . . . It is likewise generally recognized law that a jury may find that negligence exists toward a pedestrian using a permissive path on the railroad right of way if he is hit by some object projecting from the side of the train."

The Erie had contended that application of the Pennsylvania rule was required, among other things, by § 34 of the Federal Judiciary Act of September 24, 1789, c. 20, 28 U. S. C. § 725, which provides:

"The laws of the several States, except where the Constitution, treaties, or statutes of the United States otherwise require or provide, shall be regarded as rules of decision in trials at common law, in the courts of the United States, in cases where they apply."

Because of the importance of the question whether the federal court was free to disregard the alleged rule of the Pennsylvania common law, we granted certiorari.

*First. Swift* v. *Tyson,* 16 Pet. 1, 18, held that federal courts exercising jurisdiction on the ground of diversity of citizenship need not, in matters of general jurisprudence, apply the unwritten law of the State as declared by its highest court; that they are free to exercise an independent judgment as to what the common law of the State is—or should be; and that, as there stated by Mr. Justice Story:

"the true interpretation of the thirty-fourth section limited its application to state laws strictly local, that is to say, to the positive statutes of the state, and the construction thereof adopted by the local tribunals, and to rights and titles to things having a permanent locality, such as the rights and titles to real estate, and other matters immovable and intraterritorial in their nature and character. It never has been supposed by us, that the section did apply, or was intended to apply, to questions of a more general nature, not at all dependent upon local statutes or local usages of a fixed and permanent operation, as, for example, to the construction of ordinary contracts or other written instruments, and especially to questions of general commercial law, where the state tribunals are called upon to perform the like functions as ourselves, that is, to ascertain upon general reasoning and legal analogies, what is the true exposition of the contract or

instrument, or what is the just rule furnished by the principles of commercial law to govern the case."

The Court in applying the rule of § 34 to equity cases, in *Mason* v. *United States,* 260 U. S. 545, 559, said: "The statute, however, is merely declarative of the rule which would exist in the absence of the statute." [2]   The federal courts assumed, in the broad field of "general law," the power to declare rules of decision which Congress was confessedly without power to enact as statutes.   Doubt was repeatedly expressed as to the correctness of the construction given § 34,[3] and as to the soundness of the rule which it introduced.[4]   But it was the more recent research of a competent scholar, who examined the original document, which established that the construction given to it by the Court was erroneous; and that the purpose of the section was merely to make certain that, in all matters except those in which some federal law is controlling,

---

[2] In *Hawkins* v. *Barney's Lessee,* 5 Pet. 457, 464, it was stated that § 34 "has been uniformly held to be no more than a declaration of what the law would have been without it: to wit, that the lex loci must be the governing rule of private right, under whatever jurisdiction private right comes to be examined." See also *Bank of Hamilton* v. *Dudley's Lessee,* 2 Pet. 492, 525.   Compare *Jackson* v. *Chew,* 12 Wheat. 153, 162, 168; *Livingston* v. *Moore,* 7 Pet. 469, 542.

[3] Pepper, The Border Land of Federal and State Decisions (1889) 57; Gray, The Nature and Sources of Law (1909 ed.) §§ 533–34; Trickett, Non-Federal Law Administered in Federal Courts (1906) 40 Am. L. Rev. 819, 821–24.

[4] Street, Is There a General Commercial Law of the United States (1873) 21 Am. L. Reg. 473; Hornblower, Conflict between State and Federal Decisions (1880) 14 Am. L. Rev. 211; Meigs, Decisions of the Federal Courts on Questions of State Law (1882) 8 So. L. Rev. (n. s.) 452, (1911) 45 Am. L. Rev. 47; Heiskell, Conflict between Federal and State Decisions (1882) 16 Am. L. Rev. 743; Rand, *Swift* v. *Tyson* versus *Gelpcke* v. *Dubuque* (1895) 8 Harv. L. Rev. 328, 341–43; Mills, Should Federal Courts Ignore State Laws (1900) 34 Am. L. Rev. 51; Carpenter, Court Decisions and the Common Law (1917) 17 Col. L. Rev. 593, 602–03.

the federal courts exercising jurisdiction in diversity of citizenship cases would apply as their rules of decision the law of the State, unwritten as well as written.[5]

Criticism of the doctrine became widespread after the decision of *Black & White Taxicab Co.* v. *Brown & Yellow Taxicab Co.*, 276 U. S. 518.[6]  There, Brown and Yellow, a Kentucky corporation owned by Kentuckians, and the Louisville and Nashville Railroad, also a Kentucky corporation, wished that the former should have the exclusive privilege of soliciting passenger and baggage transportation at the Bowling Green, Kentucky, railroad station; and that the Black and White, a competing Kentucky corporation, should be prevented from interfering with that privilege.   Knowing that such a contract would be void under the common law of Kentucky, it was arranged that the Brown and Yellow reincorporate under the law of Tennessee, and that the contract with the railroad should be executed there.   The suit was then brought by the Tennessee corporation in the federal court for western Kentucky to enjoin competition by the Black and White; an injunction issued by the District Court

---

[5] Charles Warren, New Light on the History of the Federal Judiciary Act of 1789 (1923) 37 Harv. L. Rev. 49, 51–52, 81–88, 108.

[6] Shelton, Concurrent Jurisdiction—Its Necessity and its Dangers (1928) 15 Va. L. Rev. 137; Frankfurter, Distribution of Judicial Power Between Federal and State Courts (1928) 13 Corn. L. Q. 499, 524–30; Johnson, State Law and the Federal Courts (1929) 17 Ky. L. J. 355; Fordham, The Federal Courts and the Construction of Uniform State Laws (1929) 7 N. C. L. Rev. 423; Dobie, Seven Implications of Swift v. Tyson (1930) 16 Va. L. Rev. 225; Dawson, Conflict of Decisions between State and Federal Courts in Kentucky, and the Remedy (1931) 20 Ky. L. J. 1; Campbell, Is Swift v. Tyson an Argument for or against Abolishing Diversity of Citizenship Jurisdiction (1932) 18 A. B. A. J. 809; Ball, Revision of Federal Diversity Jurisdiction (1933) 28 Ill. L. Rev. 356, 362–64; Fordham, Swift v. Tyson and the Construction of State Statutes (1935) 41 W. Va. L. Q. 131.

was sustained by the Court of Appeals; and this Court, citing many decisions in which the doctrine of *Swift* v. *Tyson* had been applied, affirmed the decree.

*Second.* Experience in applying the doctrine of *Swift* v. *Tyson,* had revealed its defects, political and social; and the benefits expected to flow from the rule did not accrue. Persistence of state courts in their own opinions on questions of common law prevented uniformity;[7] and the impossibility of discovering a satisfactory line of demarcation between the province of general law and that of local law developed a new well of uncertainties.[8]

On the other hand, the mischievous results of the doctrine had become apparent. Diversity of citizenship jurisdiction was conferred in order to prevent apprehended discrimination in state courts against those not citizens of the State. *Swift* v. *Tyson* introduced grave discrimination by non-citizens against citizens. It made rights enjoyed under the unwritten "general law" vary according to whether enforcement was sought in the state

[7] Compare Mr. Justice Miller in *Gelpcke* v. *City of Dubuque,* 1 Wall. 175, 209. The conflicts listed in Holt, The Concurrent Jurisdiction of the Federal and State Courts (1888) 160 *et seq.* cover twenty-eight pages. See also Frankfurter, *supra* note 6, at 524–30; Dawson, *supra* note 6; Note, Aftermath of the Supreme Court's Stop, Look and Listen Rule (1930) 43 Harv. L. Rev. 926; cf. Yntema and Jaffin, Preliminary Analysis of Concurrent Jurisdiction (1931) 79 U. of Pa. L. Rev. 869, 881–86. Moreover, as pointed out by Judge Augustus N. Hand in *Cole* v. *Pennsylvania R. Co.,* 43 F. 2d 953, 956–57, decisions of this Court on common law questions are less likely than formerly to promote uniformity.

[8] Compare 2 Warren, The Supreme Court in United States History (rev. ed. 1935) 89: "Probably no decision of the Court has ever given rise to more uncertainty as to legal rights; and though doubtless intended to promote uniformity in the operation of business transactions, its chief effect has been to render it difficult for business men to know in advance to what particular topic the Court would apply the doctrine. . . ." The Federal Digest, through the 1937 volume, lists nearly 1000 decisions involving the distinction between questions of general and of local law.

or in the federal court; and the privilege of selecting the court in which the right should be determined was conferred upon the non-citizen.[9] Thus, the doctrine rendered impossible equal protection of the law. In attempting to promote uniformity of law throughout the United States, the doctrine had prevented uniformity in the administration of the law of the State.

The discrimination resulting became in practice far-reaching. This resulted in part from the broad province accorded to the so-called "general law" as to which federal courts exercised an independent judgment.[10] In addition to questions of purely commercial law, "general law" was held to include the obligations under contracts entered into and to be performed within the State,[11] the extent to which a carrier operating within a State may stipulate for exemption from liability for his own negligence or that of his employee;[12] the liability for torts committed within the State upon persons resident or property located there, even where the question of lia-

[9] It was even possible for a non-resident plaintiff defeated on a point of law in the highest court of a State nevertheless to win out by taking a nonsuit and renewing the controversy in the federal court. Compare *Gardner* v. *Michigan Cent. R. Co.*, 150 U. S. 349; *Harrison* v. *Foley*, 206 Fed. 57 (C. C. A. 8); *Interstate Realty & Inv. Co.* v. *Bibb County*, 293 Fed. 721 (C. C. A. 5); see Mills, *supra* note 4, at 52.

[10] For a recent survey of the scope of the doctrine, see Sharp & Brennan, The Application of the Doctrine of Swift *v.* Tyson since 1900 (1929) 4 Ind. L. J. 367.

[11] *Black & White Taxicab Co.* v. *Brown & Yellow Taxicab Co.*, 276 U. S. 518; *Rowan* v. *Runnels*, 5 How. 134, 139; *Boyce* v. *Tabb*, 18 Wall. 546, 548; *Johnson* v. *Chas. D. Norton Co.*, 159 Fed. 361 (C. C. A. 6); *Keene Five Cent Sav. Bank* v. *Reid*, 123 Fed. 221 (C. C. A. 8).

[12] *Railroad Co.* v. *Lockwood*, 17 Wall. 357, 367–68; *Liverpool & G. W. Steam Co.* v. *Phenix Ins. Co.*, 129 U. S. 397, 443; *Eels* v. *St. Louis, K. & N. W. Ry. Co.*, 52 Fed. 903 (C. C. S. D. Iowa); *Fowler* v. *Pennsylvania R. Co.*, 229 Fed. 373 (C. C. A. 2).

bility depended upon the scope of a property right conferred by the State;[13] and the right to exemplary or punitive damages.[14] Furthermore, state decisions construing local deeds,[15] mineral conveyances,[16] and even devises of real estate[17] were disregarded.[18]

In part the discrimination resulted from the wide range of persons held entitled to avail themselves of the federal rule by resort to the diversity of citizenship jurisdiction. Through this jurisdiction individual citizens willing to remove from their own State and become citizens of another might avail themselves of the federal rule.[19] And, without even change of residence, a corporate citizen of

---

[13] *Chicago* v. *Robbins,* 2 Black 418, 428. Compare *Yates* v. *Milwaukee,* 10 Wall. 497, 506–07; *Yeates* v. *Illinois Cent. R. Co.,* 137 Fed. 943 (C. C. N. D. Ill.); *Curtis* v. *Cleveland, C. C. & St. L. Ry. Co.,* 140 Fed. 777 (C. C. E. D. Ill.). See also *Hough* v. *Railway Co.,* 100 U. S. 213, 226; *Baltimore & Ohio R. Co.* v. *Baugh,* 149 U. S. 368; *Gardner* v. *Michigan Cent. R. Co.,* 150 U. S. 349, 358; *Beutler* v. *Grand Trunk Junction Ry. Co.,* 224 U. S. 85; *Baltimore & Ohio R. Co.* v. *Goodman,* 275 U. S. 66; *Pokora* v. *Wabash Ry. Co.,* 292 U. S. 98; *Cole* v. *Pennsylvania R. Co.,* 43 F. (2d) 953 (C. C. A. 2).

[14] *Lake Shore & M. S. Ry. Co.* v. *Prentice,* 147 U. S. 101, 106; *Norfolk & P. Traction Co.* v. *Miller,* 174 Fed. 607 (C. C. A. 4); *Greene* v. *Keithley,* 86 F. (2d) 239 (C. C. A. 8).

[15] *Foxcroft* v. *Mallet,* 4 How. 353, 379; *Midland Valley R. Co.* v. *Sutter,* 28 F. (2d) 163 (C. C. A. 8); *Midland Valley R. Co.* v. *Jarvis,* 29 F. (2d) 539 (C. C. A. 8).

[16] *Kuhn* v. *Fairmont Coal Co.,* 215 U. S. 349; *Mid-Continent Petroleum Corp.* v. *Sauder,* 67 F. (2d) 9, 12 (C. C. A. 10), reversed on other grounds, 292 U. S. 272.

[17] *Lane* v. *Vick,* 3 How. 464, 476; *Barber* v. *Pittsburgh, F. W. & C. R. Co.,* 166 U. S. 83, 99–100; *Messinger* v. *Anderson,* 171 Fed. 785, 791–792 (C. C. A. 6), reversed on other grounds, 225 U. S. 436; *Knox & Lewis* v. *Alwood,* 228 Fed. 753 (S. D. Ga.).

[18] Compare, also, *Williamson* v. *Berry,* 8 How. 495; *Watson* v. *Tarpley,* 18 How. 517; *Gelpcke* v. *City of Dubuque,* 1 Wall. 175.

[19] See *Cheever* v. *Wilson,* 9 Wall. 108, 123; *Robertson* v. *Carson,* 19 Wall. 94, 106–07; *Morris* v. *Gilmer,* 129 U. S. 315, 328; *Dickerman* v. *Northern Trust Co.,* 176 U. S. 181, 192; *Williamson* v. *Osenton,* 232 U. S. 619, 625.

the State could avail itself of the federal rule by re-incorporating under the laws of another State, as was done in the *Taxicab* case.

The injustice and confusion incident to the doctrine of *Swift* v. *Tyson* have been repeatedly urged as reasons for abolishing or limiting diversity of citizenship jurisdiction.[20] Other legislative relief has been proposed.[21] If only a question of statutory construction were involved, we should not be prepared to abandon a doctrine so widely applied throughout nearly a century.[22] But the uncon-

[20] See, e. g., Hearings Before a Subcommittee of the Senate Committee on the Judiciary on S. 937, S. 939, and S. 3243, 72d Cong., 1st Sess. (1932) 6–8; Hearing Before the House Committee on the Judiciary on H. R. 10594, H. R. 4526, and H. R. 11508, 72d Cong., 1st Sess., ser. 12 (1932) 97–104; Sen. Rep. No. 530, 72d Cong., 1st Sess. (1932) 4–6; Collier, A Plea Against Jurisdiction Because of Diversity (1913) 76 Cent. L. J. 263, 264, 266; Frankfurter, *supra* note 6; Ball, *supra* note 6; Warren, Corporations and Diversity of Citizenship (1933) 19 Va. L. Rev. 661, 686.

[21] Thus, bills which would abrogate the doctrine of *Swift* v. *Tyson* have been introduced. S. 4333, 70th Cong., 1st Sess.; S. 96, 71st Cong., 1st Sess.; H. R. 8094, 72d Cong., 1st Sess. See also Mills, *supra* note 4, at 68–69; Dobie, *supra* note 6, at 241; Frankfurter, *supra* note 6, at 530; Campbell, *supra* note 6, at 811. State statutes on conflicting questions of "general law" have also been suggested. See Heiskell, *supra* note 4, at 760; Dawson, *supra* note 6; Dobie, *supra* note 6, at 241.

[22] The doctrine has not been without defenders. See Eliot, The Common Law of the Federal Courts (1902) 36 Am. L. Rev. 498, 523–25; A. B. Parker, The Common Law Jurisdiction of the United States Courts (1907) 17 Yale L. J. 1; Schofield, Swift *v.* Tyson: Uniformity of Judge-Made State Law in State and Federal Courts (1910) 4 Ill. L. Rev. 533; Brown, The Jurisdiction of the Federal Courts Based on Diversity of Citizenship (1929) 78 U. of Pa. L. Rev. 179, 189–91; J. J. Parker, The Federal Jurisdiction and Recent Attacks Upon It (1932) 18 A. B. A. J. 433, 438; Yntema, The Jurisdiction of the Federal Courts in Controversies Between Citizens of Different States (1933) 19 A. B. A. J. 71, 74–75; Beutel, Common Law Judicial Technique and the Law of Negotiable Instruments— Two Unfortunate Decisions (1934) 9 Tulane L. Rev. 64.

stitutionality of the course pursued has now been made clear and compels us to do so.

*Third.* Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State. And whether the law of the State shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern. There is no federal general common law. Congress has no power to declare substantive rules of common law applicable in a State whether they be local in their nature or "general," be they commercial law or a part of the law of torts. And no clause in the Constitution purports to confer such a power upon the federal courts. As stated by Mr. Justice Field when protesting in *Baltimore & Ohio R. Co.* v. *Baugh,* 149 U. S. 368, 401, against ignoring the Ohio common law of fellow servant liability:

"I am aware that what has been termed the general law of the country—which is often little less than what the judge advancing the doctrine thinks at the time should be the general law on a particular subject—has been often advanced in judicial opinions of this court to control a conflicting law of a State. I admit that learned judges have fallen into the habit of repeating this doctrine as a convenient mode of brushing aside the law of a State in conflict with their views. And I confess that, moved and governed by the authority of the great names of those judges, I have, myself, in many instances, unhesitatingly and confidently, but I think now erroneously, repeated the same doctrine. But, notwithstanding the great names which may be cited in favor of the doctrine, and notwithstanding the frequency with which the doctrine has been reiterated, there stands, as a perpetual protest against its repetition, the Constitution of the United States, which recognizes and preserves the autonomy and independence of the States—independence in their legislative and inde-

pendence in their judicial departments. Supervision over either the legislative or the judicial action of the States is in no case permissible except as to matters by the Constitution specifically authorized or delegated to the United States. Any interference with either, except as thus permitted, is an invasion of the authority of the State and, to that extent, a denial of its independence."

The fallacy underlying the rule declared in *Swift* v. *Tyson* is made clear by Mr. Justice Holmes.[23] The doctrine rests upon the assumption that there is "a transcendental body of law outside of any particular State but obligatory within it unless and until changed by statute," that federal courts have the power to use their judgment as to what the rules of common law are; and that in the federal courts "the parties are entitled to an independent judgment on matters of general law":

"but law in the sense in which courts speak of it today does not exist without some definite authority behind it. The common law so far as it is enforced in a State, whether called common law or not, is not the common law generally but the law of that State existing by the authority of that State without regard to what it may have been in England or anywhere else. . . .

"the authority and only authority is the State, and if that be so, the voice adopted by the State as its own [whether it be of its Legislature or of its Supreme Court] should utter the last word."

Thus the doctrine of *Swift* v. *Tyson* is, as Mr. Justice Holmes said, "an unconstitutional assumption of powers by courts of the United States which no lapse of time or respectable array of opinion should make us hesitate to correct." In disapproving that doctrine we do not hold

---

[23] *Kuhn* v. *Fairmont Coal Co.*, 215 U. S. 349, 370–372; *Black & White Taxicab Co.* v. *Brown & Yellow Taxicab Co.*, 276 U. S. 518, 532–36.

unconstitutional § 34 of the Federal Judiciary Act of
1789 or any other Act of Congress. We merely declare
that in applying the doctrine this Court and the lower
courts have invaded rights which in our opinion are re-
served by the Constitution to the several States.

*Fourth.* The defendant contended that by the com-
mon law of Pennsylvania as declared by its highest court
in *Falchetti* v. *Pennsylvania R. Co.,* 307 Pa. 203; 160 A.
859, the only duty owed to the plaintiff was to refrain
from wilful or wanton injury. The plaintiff denied that
such is the Pennsylvania law.[24] In support of their re-
spective contentions the parties discussed and cited many
decisions of the Supreme Court of the State. The Cir-
cuit Court of Appeals ruled that the question of liability
is one of general law; and on that ground declined to de-
cide the issue of state law. As we hold this was error,
the judgment is reversed and the case remanded to it for
further proceedings in conformity with our opinion.

*Reversed.*

MR. JUSTICE CARDOZO took no part in the consideration
or decision of this case.

MR. JUSTICE BUTLER.

The case presented by the evidence is a simple one.
Plaintiff was severely injured in Pennsylvania. While
walking on defendant's right of way along a much-used
path at the end of the cross ties of its main track, he came
into collision with an open door swinging from the side
of a car in a train going in the opposite direction. Having
been warned by whistle and headlight, he saw the locomo-

---

[24] Tompkins also contended that the alleged rule of the *Falchetti*
case is not in any event applicable here because he was struck at the
intersection of the longitudinal pathway and a transverse crossing.
The court below found it unnecessary to consider this contention, and
we leave the question open.

tive approaching and had time and space enough to step aside and so avoid danger. To justify his failure to get out of the way, he says that upon many other occasions he had safely walked there while trains passed.

Invoking jurisdiction on the ground of diversity of citizenship, plaintiff, a citizen and resident of Pennsylvania, brought this suit to recover damages against defendant, a New York corporation, in the federal court for the southern district of that State. The issues were whether negligence of defendant was a proximate cause of his injuries and whether negligence of plaintiff contributed. He claimed that, by hauling the car with the open door, defendant violated a duty to him. The defendant insisted that it violated no duty and that plaintiff's injuries were caused by his own negligence. The jury gave him a verdict on which the trial court entered judgment; the circuit court of appeals affirmed. 90 F. (2d) 603.

Defendant maintained, citing *Falchetti* v. *Pennsylvania R. Co.*, 307 Pa. 203; 160 A. 859, and *Koontz* v. *B. & O. R. Co.*, 309 Pa. 122; 163 A. 212, that the only duty owed plaintiff was to refrain from willfully or wantonly injuring him; it argued that the courts of Pennsylvania had so ruled with respect to persons using a customary longitudinal path, as distinguished from one crossing the track. The plaintiff insisted that the Pennsylvania decisions did not establish the rule for which the defendant contended. Upon that issue the circuit court of appeals said (p. 604): "We need not go into this matter since the defendant concedes that the great weight of authority in other states is to the contrary. This concession is fatal to its contention, for upon questions of general law the federal courts are free, in absence of a local statute, to exercise their independent judgment as to what the law is; and it is well settled that the question of the responsibility of a railroad for injuries caused by its servants is one of general law."

Upon that basis the court held the evidence sufficient to sustain a finding that plaintiff's injuries were caused by the negligence of defendant. It also held the question of contributory negligence one for the jury.

Defendant's petition for writ of certiorari presented two questions: Whether its duty toward plaintiff should have been determined in accordance with the law as found by the highest court of Pennsylvania, and whether the evidence conclusively showed plaintiff guilty of contributory negligence. Plaintiff contends that, as always heretofore held by this Court, the issues of negligence and contributory negligence are to be determined by general law against which local decisions may not be held conclusive; that defendant relies on a solitary Pennsylvania case of doubtful applicability and that, even if the decisions of the courts of that State were deemed controlling, the same result would have to be reached.

No constitutional question was suggested or argued below or here. And as a general rule, this Court will not consider any question not raised below and presented by the petition. *Olson* v. *United States,* 292 U. S. 246, 262, *Johnson* v. *Manhattan Ry. Co.,* 289 U. S. 479, 494. *Gunning* v. *Cooley,* 281 U. S. 90, 98. Here it does not decide either of the questions presented but, changing the rule of decision in force since the foundation of the Government, remands the case to be adjudged according to a standard never before deemed permissible.

The opinion just announced states that "the question for decision is whether the oft-challenged doctrine of *Swift* v. *Tyson* [1842, 16 Pet. 1] shall now be disapproved."

That case involved the construction of the Judiciary Act of 1789, § 34: "The laws of the several states, except where the Constitution, treaties, or statutes of the United States otherwise require or provide, shall be regarded as rules of decision in trials at common law in the courts of

the United States in cases where they apply." Expressing the view of all the members of the Court, Mr. Justice Story said (p. 18): "In the ordinary use of language it will hardly be contended that the decisions of Courts constitute laws. They are, at most, only evidence of what the laws are, and not of themselves laws. They are often re-examined, reversed, and qualified by the Courts themselves, whenever they are found to be either defective, or ill-founded, or otherwise incorrect. The laws of a state are more usually understood to mean the rules and enactments promulgated by the legislative authority thereof, or long established local customs having the force of laws. *In all the various cases, which have hitherto come before us for decision, this Court have uniformly supposed,* that the true interpretation of the thirty-fourth section limited its application to state laws strictly local, that is to say, to the positive statutes of the state, and the construction thereof adopted by the local tribunals, and to rights and titles to things having a permanent locality, such as the rights and titles to real estate, and other matters immovable and intraterritorial in their nature and character. *It never has been supposed by us,* that the section did apply, or was designed to apply, to questions of a more general nature, not at all dependent upon local statutes or local usages of a fixed and permanent operation, as, for example, to the construction of ordinary contracts or other written instruments, and especially to questions of general commercial law, where the state tribunals are called upon to perform the like functions as ourselves, that is, to ascertain upon general reasoning and legal analogies, what is the true exposition of the contract or instrument, or what is the just rule furnished by the principles of commercial law to govern the case. *And we have not now the slightest difficulty in holding,* that this section, upon its true intendment and construction, is strictly limited to local statutes and local usages of the character

before stated, and does not extend to contracts and other instruments of a commercial nature, the true interpretation and effect whereof are to be sought, not in the decisions of the local tribunals, but in the general principles and doctrines of commercial jurisprudence. Undoubtedly, the decisions of the local tribunals upon such subjects are entitled to, and will receive, the most deliberate attention and respect of this Court; but they cannot furnish positive rules, or conclusive authority, by which our own judgments are to be bound up and governed." (Italics added.)

The doctrine of that case has been followed by this Court in an unbroken line of decisions. So far as appears, it was not questioned until more than 50 years later, and then by a single judge.[1] *Baltimore & Ohio R. Co.* v. *Baugh,* 149 U. S. 368, 390. In that case, Mr. Justice Brewer, speaking for the Court, truly said (p. 373): "Whatever differences of opinion may have been expressed, have not been on the question whether a matter of general law should be settled by the independent judgment of this court, rather than through an adherence to the decisions of the state courts, but upon the other question, whether a given matter is one of local or of general law."

And since that decision, the division of opinion in this Court has been one of the same character as it was before. In 1910, Mr. Justice Holmes, speaking for himself and two other Justices, dissented from the holding that a

---

[1] Mr. Justice Field filed a dissenting opinion, several sentences of which are quoted in the decision just announced. The dissent failed to impress any of his associates. It assumes that adherence to § 34 as construed involves a supervision over legislative or judicial action of the states. There is no foundation for that suggestion. Clearly the dissent of the learned Justice rests upon misapprehension of the rule. He joined in applying the doctrine for more than a quarter of a century before his dissent. The reports do not disclose that he objected to it in any later case. Cf. *Oakes* v. *Mase,* 165 U. S. 363.

court of the United States was bound to exercise its own independent judgment in the construction of a conveyance made before the state courts had rendered an authoritative decision as to its meaning and effect. *Kuhn* v. *Fairmont Coal Co.*, 215 U. S. 349. But that dissent accepted (p. 371) as "settled" the doctrine of *Swift* v. *Tyson*, and insisted (p. 372) merely that the case under consideration was by nature and necessity peculiarly local.

Thereafter, as before, the doctrine was constantly applied.[2] In *Black & White Taxicab Co.* v. *Brown & Yellow Taxicab Co.*, 276 U. S. 518, three judges dissented. The writer of the dissent, Mr. Justice Holmes, said, however (p. 535): "I should leave *Swift* v. *Tyson* undisturbed, as I indicated in *Kuhn* v. *Fairmont Coal Co.*, but I would not allow it to spread the assumed dominion into new fields."

No more unqualified application of the doctrine can be found than in decisions of this Court speaking through Mr. Justice Holmes. *United Zinc Co.* v. *Britt*, 258 U. S. 268. *Baltimore & Ohio R. Co.* v. *Goodman*, 275 U. S. 66, 70. Without in the slightest departing from that doctrine, but implicitly applying it, the strictness of the rule laid down in the *Goodman* case was somewhat ameliorated by *Pokora* v. *Wabash Ry. Co.*, 292 U. S. 98.

Whenever possible, consistently with standards sustained by reason and authority constituting the general law, this Court has followed applicable decisions of state courts. *Mutual Life Ins. Co.* v. *Johnson*, 293 U. S. 335, 339. See *Burgess* v. *Seligman*, 107 U. S. 20, 34. *Black & White Taxicab Co.* v. *Brown & Yellow Taxicab Co.*, *supra*, 530. Unquestionably the issues of negligence and contributory negligence upon which decision of this case

---

[2] In *Salem Trust Co.* v. *Manufacturers' Finance Co.*, 264 U. S. 182, Mr. Justice Holmes and Mr. Justice Brandeis concurred (p. 200) in the judgment of the Court upon a question of general law on the ground that the rights of the parties were governed by state law.

depends are questions of general law. *Hough* v. *Railway Co.*, 100 U. S. 213, 226. *Lake Shore & M. S. Ry. Co.* v. *Prentice*, 147 U. S. 101. *Baltimore & Ohio R. Co.* v. *Baugh, supra.* *Gardner* v. *Michigan Central R. Co.*, 150 U. S. 349, 358. *Central Vermont Ry. Co.* v. *White*, 238 U. S. 507, 512. *Baltimore & Ohio R. Co.* v. *Goodman, supra.* *Pokora* v. *Wabash Ry. Co., supra.*

While amendments to § 34 have from time to time been suggested, the section stands as originally enacted. Evidently Congress has intended throughout the years that the rule of decision as construed should continue to govern federal courts in trials at common law. The opinion just announced suggests that Mr. Warren's research has established that from the beginning this Court has erroneously construed § 34. But that author's "New Light on the History of the Federal Judiciary Act of 1789" does not purport to be authoritative and was intended to be no more than suggestive. The weight to be given to his discovery has never been discussed at this bar. Nor does the opinion indicate the ground disclosed by the research. In his dissenting opinion in the *Taxicab* case, Mr. Justice Holmes referred to Mr. Warren's work but failed to persuade the Court that "laws" as used in § 34 included varying and possibly ill-considered rulings by the courts of a State on questions of common law. See, e. g., *Swift* v. *Tyson, supra,* 16–17. It well may be that, if the Court should now call for argument of counsel on the basis of Mr. Warren's research, it would adhere to the construction it has always put upon § 34. Indeed, the opinion in this case so indicates. For it declares: "If only a question of statutory construction were involved, we should not be prepared to abandon a doctrine so widely applied throughout a century. But the unconstitutionality of the course pursued has now been made clear and compels us to do so." This means that, so far as concerns the rule of decision now condemned, the Judiciary Act of 1789, passed to establish judicial

courts to exert the judicial power of the United States, and especially § 34 of that Act as construed, is unconstitutional; that federal courts are now bound to follow decisions of the courts of the State in which the controversies arise; and that Congress is powerless otherwise to ordain. It is hard to foresee the consequences of the radical change so made. Our opinion in the *Taxicab* case cites numerous decisions of this Court which serve in part to indicate the field from which it is now intended forever to bar the federal courts. It extends to all matters of contracts and torts not positively governed by state enactments. Counsel searching for precedent and reasoning to disclose common-law principles on which to guide clients and conduct litigation are by this decision told that as to all of these questions the decisions of this Court and other federal courts are no longer anywhere authoritative.

This Court has often emphasized its reluctance to consider constitutional questions, and that legislation will not be held invalid as repugnant to the fundamental law if the case may be decided upon any other ground. In view of grave consequences liable to result from erroneous exertion of its power to set aside legislation, the Court should move cautiously, seek assistance of counsel, act only after ample deliberation, show that the question is before the Court, that its decision cannot be avoided by construction of the statute assailed or otherwise, indicate precisely the principle or provision of the Constitution held to have been transgressed, and fully disclose the reasons and authorities found to warrant the conclusion of invalidity. These safeguards against the improvident use of the great power to invalidate legislation are so well-grounded and familiar that statement of reasons or citation of authority to support them is no longer necessary. But see e. g.: *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420, 553; *Township of Pine Grove* v. *Talcott,* 19 Wall. 666, 673; *Chicago & G. T. Ry. Co.* v. *Wellman,* 143 U. S. 339, 345;

*Baker* v. *Grice,* 169 U. S. 284, 292; *Martin* v. *District of Columbia,* 205 U. S. 135, 140.

So far as appears, no litigant has ever challenged the power of Congress to establish the rule as construed. It has so long endured that its destruction now without appropriate deliberation cannot be justified. There is nothing in the opinion to suggest that consideration of any constitutional question is necessary to a decision of the case. By way of reasoning, it contains nothing that requires the conclusion reached. Admittedly, there is no authority to support that conclusion. Against the protest of those joining in this opinion, the Court declines to assign the case for reargument. It may not justly be assumed that the labor and argument of counsel for the parties would not disclose the right conclusion and aid the Court in the statement of reasons to support it. Indeed, it would have been appropriate to give Congress opportunity to be heard before devesting it of power to prescribe rules of decision to be followed in the courts of the United States. See *Myers* v. *United States,* 272 U. S. 52, 176.

The course pursued by the Court in this case is repugnant to the Act of Congress of August 24, 1937, 50 Stat. 751. It declares: "That whenever the constitutionality of any Act of Congress affecting the public interest is drawn in question in any court of the United States in any suit or proceeding to which the United States, or any agency thereof, or any officer or employee thereof, as such officer or employee, is not a party, the court having jurisdiction of the suit or proceeding shall certify such fact to the Attorney General. In any such case the court shall permit the United States to intervene and become a party for presentation of evidence (if evidence is otherwise receivable in such suit or proceeding) and argument upon the question of the constitutionality of such Act. In any such suit or proceeding the United States shall, subject to the applicable provisions of law, have all the rights of a

party and the liabilities of a party as to court costs to the extent necessary for a proper presentation of the facts and law relating to the constitutionality of such Act." That provision extends to this Court. § 5. If defendant had applied for and obtained the writ of certiorari upon the claim that, as now held, Congress has no power to prescribe the rule of decision, § 34 as construed, it would have been the duty of this Court to issue the prescribed certificate to the Attorney General in order that the United States might intervene and be heard on the constitutional question. Within the purpose of the statute and its true intent and meaning, the constitutionality of that measure has been "drawn in question." Congress intended to give the United States the right to be heard in every case involving constitutionality of an Act affecting the public interest. In view of the rule that, in the absence of challenge of constitutionality, statutes will not here be invalidated on that ground, the Act of August 24, 1937 extends to cases where constitutionality is first "drawn in question" by the Court. No extraordinary or unusual action by the Court after submission of the cause should be permitted to frustrate the wholesome purpose of that Act. The duty it imposes ought here to be willingly assumed. If it were doubtful whether this case is within the scope of the Act, the Court should give the United States opportunity to intervene and, if so advised, to present argument on the constitutional question, for undoubtedly it is one of great public importance. That would be to construe the Act according to its meaning.

The Court's opinion in its first sentence defines the question to be whether the doctrine of *Swift* v. *Tyson* shall now be disapproved; it recites (p. 72) that Congress is without power to prescribe rules of decision that have been followed by federal courts as a result of the construction of § 34 in *Swift* v. *Tyson* and since; after discussion, it declares (pp. 77–78) that "the unconstitutionality of the course pursued [meanin  the rule of decision

resulting from that construction] compels" abandonment
of the doctrine so long applied; and then near the end
of the last page the Court states that it does not hold
§ 34 unconstitutional, but merely that, in applying the
doctrine of *Swift* v. *Tyson* construing it, this Court and
the lower courts have invaded rights which are reserved
by the Constitution to the several States. But, plainly
through the form of words employed, the substance of
the decision appears; it strikes down as unconstitutional
§ 34 as construed by our decisions; it divests the Con-
gress of power to prescribe rules to be followed by federal
courts when deciding questions of general law. In that
broad field it compels this and the lower federal courts
to follow decisions of the courts of a particular State.

I am of opinion that the constitutional validity of the
rule need not be considered, because under the law, as
found by the courts of Pennsylvania and generally
throughout the country, it is plain that the evidence
required a finding that plaintiff was guilty of negligence
that contributed to cause his injuries and that the judg-
ment below should be reversed upon that ground.

MR. JUSTICE MCREYNOLDS concurs in this opinion.

MR. JUSTICE REED.

I concur in the conclusion reached in this case, in the
disapproval of the doctrine of *Swift* v. *Tyson,* and in the
reasoning of the majority opinion except in so far as it
relies upon the unconstitutionality of the "course pur-
sued" by the federal courts.

The "doctrine of *Swift* v. *Tyson*," as I understand it,
is that the words "the laws," as used in § 34, line one, of
the Federal Judiciary Act of September 24, 1789, do not
include in their meaning "the decisions of the local tri-
bunals." Mr. Justice Story, in deciding that point, said
(16 Pet. 19):

"Undoubtedly, the decisions of the local tribunals upon such subjects are entitled to, and will receive, the most deliberate attention and respect of this Court; but they cannot furnish positive rules, or conclusive authority, by which our own judgments are to be bound up and governed."

To decide the case now before us and 'to "disapprove" the doctrine of *Swift* v. *Tyson* requires only that we say that the words "the laws" include in their meaning the decisions of the local tribunals. As the majority opinion shows, by its reference to Mr. Warren's researches and the first quotation from Mr. Justice Holmes, that this Court is now of the view that "laws" includes "decisions," it is unnecessary to go further and declare that the "course pursued" was "unconstitutional," instead of merely erroneous.

The "unconstitutional" course referred to in the majority opinion is apparently the ruling in *Swift* v. *Tyson* that the supposed omission of Congress to legislate as to the effect of decisions leaves federal courts free to interpret general law for themselves. I am not at all sure whether, in the absence of federal statutory direction, federal courts would be compelled to follow state decisions. There was sufficient doubt about the matter in 1789 to induce the first Congress to legislate. No former opinions of this Court have passed upon it. Mr. Justice Holmes evidently saw nothing "unconstitutional" which required the overruling of *Swift* v. *Tyson,* for he said in the very opinion quoted by the majority, "I should leave *Swift* v. *Tyson* undisturbed, as I indicated in *Kuhn* v. *Fairmont Coal Co.,* but I would not allow it to spread the assumed dominion into new fields." *Black & White Taxicab Co.* v. *Brown & Yellow Taxicab Co.,* 276 U. S. 518, 535. If the opinion commits this Court to the position that the Congress is without power to declare what rules of substantive law shall govern the federal courts,

that conclusion also seems questionable. The line between procedural and substantive law is hazy but no one doubts federal power over procedure. *Wayman* v. *Southard*, 10 Wheat. 1. The Judiciary Article and the "necessary and proper" clause of Article One may fully authorize legislation, such as this section of the Judiciary Act.

In this Court, *stare decisis*, in statutory construction, is a useful rule, not an inexorable command. *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, dissent, p. 406, note 1. Compare *Read* v. *Bishop of Lincoln*, [1892] A. C. 644, 655; *London Street Tramways Co.* v. *London County Council*, [1898] A. C. 375, 379. It seems preferable to overturn an established construction of an Act of Congress, rather than, in the circumstances of this case, to interpret the Constitution. Cf. *United States* v. *Delaware & Hudson Co.*, 213 U. S. 366.

There is no occasion to discuss further the range or soundness of these few phrases of the opinion. It is sufficient now to call attention to them and express my own non-acquiescence.