### KEHAYA v. AXTON et al.

District Court, S. D. New York.
March 15, 1940.

William Harman Black, of New York City (Myron J. Kleban and Mitchell S. Fisher, both of New York City, of counsel), for plaintiff.

Hodges, Reavis, Pantaleoni & Downey, of New York City, and Woodward, Dawson & Hobson, of Louisville, Ky. (C. Frank Reavis and Martin D. Jacobs, both of New York City, and Ernest Woodward, of Louisville, Ky., of counsel), for individual defendants.

Riegelman, Hess & Strasser, of New York City (Walter J. Fried, of New York City, of counsel), for defendant Axton-Fisher Tobacco Co.

WOOLSEY, District Judge.

My judgment in this cause is:

(1) That the complaint be dismissed on the merits with all taxable costs, disbursements and allowances to each of the defendants.

(2) That this plaintiff has not any locus standi to maintain this action by reason of the fact that he is not any longer a director of the corporate defendant, the Axton-Fisher Tobacco Company.

I. My subject matter jurisdiction herein is based on diversity of citizenship and on the fact that the amount involved exceeds the statutory requirement.

■ All questions of personal jurisdiction and of venue, such as the defendants' contention that the action involved inquiry into the management of the internal affairs of a foreign corporation, have been waived by the general appearance of all the defendants.

II. I shall now deal with the question of the locus standi of the plaintiff.

■ In the first place, I might say that in a cause like this, which is based on diversity of citizenship, the appropriate State law has to be applied under the doctrine of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487.

■ A. There seems not to be any question but that under the decision of the New York Court of Appeals on an almost identic statute, namely, the Code of Civil Procedure, Sections 1781 and 1782, an action by a director may be commenced against a foreign corporation. Miller v. Quincy, 179 N.Y. 294, 72 N.E. 116. That action, as will be observed by looking at page 302 of the opinion in 179 N.Y., 72 N.E. at page 118, was for an accounting and a restoration by directors, and in his opinion Judge O'Brien said: "In the case at bar the action is for the same purpose; that is, for an accounting and restoration. The plaintiff has summoned the defendants to appear in the courts of this state to answer for their misconduct in misappropriating or wasting the money of a corporation of which he is a director or trustee. The courts of this state have, I think, the power to require the defendants, at the suit of the plaintiff, to make good to the corporation the money taken from its treasury, and by them misappropriated or wasted."

The corporation which was involved in Miller v. Quincy, 179 N.Y. 294, 72 N.E. 116, was a corporation which had its place of business in New York. I will go so far as to assume, for the purposes of argument, that the statute invoked in Miller v. Quincy would apply also to a foreign corporation without a place of business in this State, like the Axton-Fisher Tobacco Company, the corporate defendant herein, and that a director thereof could bring action in the State courts of New York State to recover for alleged waste on the part of other directors, provided he could get personal jurisdiction of them under the practice in New York State.

Herein the two individual defendants and the corporate defendant have appeared generally after Judge Conger sustained an attachment against property of the individual defendants. Kehaya v. Axton et al., D.C., 30 F.Supp. 838.

The sole question here is whether the plaintiff, who began his action whilst he was a director of the Axton-Fisher Tobacco Company, can continue to maintain it after he ceases to have the status of a director, whatever may be the reason for his having lost such a status.

As I have already indicated above, I think that the action abates so far as the plaintiff is concerned.

In Hamilton v. Gibson, 145 App.Div. 825, 130 N.Y.S. 684, the Appellate Division of the First Department answered the question which I have posed before me here in the affirmative, and said that the action would abate.

In Manix v. Fantl, 209 App.Div. 756, 759, 205 N.Y.S. 174, the same court, with some new Judges, overruled the Hamilton case and answered the question in the negative, as it did again in Wangrow v. Wangrow, 211 App.Div. 552, 558, 207 N.Y.S. 132. See, also, dictum to the same effect in Abberger v. Kulp, 156 Misc. 210, 211, 212, 281 N.Y.S. 373.

These later decisions, aside from illustrating the mutability of judicial views, involve in their ultimate holding such a challenging concept that, it seems to me, if I am free to do so, I should consider de novo the question of abatement of the action so far as this plaintiff is concerned under the circumstances which I have before me.

■ B. Even since the infusion, by the decision of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A. L.R. 1487, of the law of the several states into federal jurisprudence when federal subject matter jurisdiction is based on diversity of citizenship, the rule remains that only the highest court of each state may expound the law thereof which must be followed under the rule of stare decisis in the federal courts. E. g., Field v. Fidelity Union Trust Company, 3 Cir., 108 F.2d 521, 525, 526, and the cases there cited.

■ I quote from the opinion in that case because it is a very excellent statement of the doctrine as it seems to me. The Circuit Court of Appeals for the Third Circuit was dealing with the question, and Judge Biddle, who recently has become Solicitor General, summarized the situation by saying this at page 526 of 108 F. 2d: "We believe that the proper rule is that federal courts should in all instances follow the law of the state with respect to the construction of state statutes. Where that law has been determined by the courts of last resort their decisions are stare decisis, and must be followed irrespective of our opinion as to what the law ought to be. As to the pronouncement of other state courts, however, we are not so bound, but

may conclude that the decision does not truly express the state law."

■ The Court of Appeals of New York State has not dealt with the question of abatement of an action of this kind under the circumstances we have here, and consequently I am free to deal with it.

The rule laid down by Judge Biddle seems long to have been the rule in this circuit, at least in respect to matters of state statutes. Irving National Bank v. Law, 2 Cir., 9 F.2d 536, 537, 538.

■ I am free therefore, in the absence of a decision by the Court of Appeals to construe a New York statute. Decisions of the Appellate Division, though often-times highly persuasive, do not bind me.

■ The argument in favor of the doctrine as laid down by the Appellate Division in the Manix and Wangrow cases is that if the suing director ceases to be a director his action does not abate, because if his ceasing to be a director made it abate, the other directors whom he is suing, could, if they got sufficient stock in their control, succeed in ousting him, and then, by making the appropriate motion, in dismissing his complaint.

My answer to that is, "Suppose that is so, what of it?"

If he is ousted as a director he no longer represents the corporation, and the only role which he can thereafter assume is that of a kind of self-appointed dominus litis, without interest, present or potential, in his subject matter, which is an anomalous situation involving gratuitous inquisition into the business of another, and fraught, it seems to me, with the dangerous possibilities always inherent in irresponsibility.

If there is real need for any redress in the corporation's behalf, such as the ex-director was supposedly seeking, it could undoubtedly have been called to the attention of other directors or to that of stockholders who are the real parties in interest after all. Cf. Scott, J., in Hamilton v. Gibson, 145 App.Div. 825, 827, 130 N.Y.S. 684.

If the situation on which the ex-director based his complaint is especially poignant the Attorney General of the State in which the corporation was created is always in the background and available on proper representations being made to him.

To hold that if a director, who has sued, loses his status as director further mainte-

nance of the suit by him is barred, does not mean that the cause of action, if there is one, has disappeared. It merely means that that particular plaintiff cannot further pursue it. Another, with the proper status, must start a new action if he be so advised.

The method in which a director loses his status as such is not in any way material in my opinion, because his right to sue is a right which depends on status. It is only a director who may maintain the action. The question here is the loss of status and naught else.

The plaintiff no longer represents the corporation in any way. I cannot imagine how he can have a status to proceed in a case in which he no longer represents it, and in the absence of a decision by the Court of Appeals, I refuse, for the reasons above indicated, to hold that he can do so.

I hold, therefore, that the complaint should be dismissed with all taxable costs, disbursements and allowances, not only on the merits which I shall hereinafter discuss, but also on the ground that the plaintiff has not now a locus standi in the action since in June 1939 he ceased to be a director.

III. In view of Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, it is now a work of supererogation to write a considered opinion on the facts or law in a non-jury cause or proceeding, for its place will be taken by formal findings of fact and conclusions of law separately stated.

In this cause, therefore, I will refer only to such facts as I think explain my decision and give a statement of my conclusions of law thereon.

The facts which I state must be supplemented by other facts to be proposed by the defendants in pursuance of my instructions to be given at the end of this opinion when they submit their proposed findings of fact and conclusions of law for my approval.

IV. I turn aside now to the question of credibility. To put it mildly, I think that the plaintiff Kehaya is not the type of person who can be a disinterested witness in a cause wherein he is a party. He made a very poor impression on me. He is the kind of witness whose evidence can never be definite unless he is pinned down by a letter or other document. I would only believe any of his evidence if it was buttressed by documents or involved admissions against his interest.

The personal defendants made a very favorable impression on me and I believed them because I thought they were, on the whole, as disinterested as witnesses could be in their own case. The witnesses for the defendants, aside from the defendants themselves, were, to my way of thinking, wholly convincing. They are among the best witnesses whom I have ever had before me.

So on the question of credibility, the case is all for the defendants.

V. Turning now to the question of the merits, which I shall not attempt to go into in great detail, I make these prefatory remarks.

First: To the present counsel for the plaintiff, Mr. Kleban, I wish to say that I understand the position in which he found himself left, and that I think he has fought a long rear guard action with most admirable tenacity, but I really think that the whole difficulty with his situation is that the plaintiff did not have any cause of action at all.

Second: All the cases brought by a director under Sections 60 and 61 of the General Corporation Law of New York State, Consol.Laws, c. 23, which have been cited to me, have apparently been like Miller v. Quincy, 179 N.Y. 294, 302, 72 N.E. 116, for fraud or waste against other directors asking an accounting and restoration.

The instant cause is an action at law for negligence and claims a specific sum of money only.

Obviously, it was so framed solely in order to enable an attachment to issue against property of the individual defendants—cf. Civil Practice Act, Section 902,—for otherwise personal jurisdiction over them would have depended wholly on their voluntary appearance in New York State.

Third: That, whatever one comes to suspect as to the motives of bringing an action, the plaintiff must have his full "day in court". Johnson v. King-Richardson Co., 1 Cir., 36 F.2d 675, 677, 67 A.L.R. 1465; Hodge et al. v. United States Steel Corporation, 64 N.J.Eq. 111, 53 A. 553, 555.

That is why I have been sitting here since February 26th, in order that the plaintiff might have a chance to make everything he possibly could out of his cause.

A. In my opinion the plaintiff has failed utterly, both in proving any negligence on the part of the defendants in the

purchase of the 1934 Bright tobaccos, which have principally been the subject matter of our discussion, and also has not proved in proper form any damages.

The complaint described the action in the twenty-third paragraph thereof as follows: "This action is to recover a sum of money only"—in other words, it is an action at law—"as damages for the aforesaid injury to the property of the Axton-Fisher"— which is the way plaintiff referred to the corporate defendant—"in consequence of the aforesaid negligence, loss and waste and neglect and failure of said defendants Edwin D. Axton, Robert L. Axton and Wood F. Axton to perform the aforesaid duties." —i. e., their duties as directors.

The damages claimed are $756,459.41.

That is as precise and definite as any amount can be, and, as I noted during the trial, it has to be predicated on the subtraction of one sum from another.

Fraud or misrepresentation by the individual defendants are not in any way here involved.

The plaintiff has to rest his cause entirely on what he calls the "gross negligence" or "stupid neglect" on the part of the individual defendants.

It seems to me that the key to this law suit is that in the early part of 1934, the Axton-Fisher Tobacco Company was selling a lot of cigarettes, especially of Twenty Grand, in which might fairly be called astronomical quantities, and it was the part of wisdom to protect its tobacco inventory against the mounting erosion of those sales. Those in charge of the Company could not expect that there would be any drop in the sales because for long the sales had been going up. It was expectable to count on bigger sales in 1935 than they had had in 1934; they certainly could not, as the managers of a company in which they were not the sole, although they were the dominant stockholders and had the greatest interest at stake, run a chance of doing anything which would cause them not to be prepared to meet any demand which might arise in subsequent years, and which they had every reason to believe would arise.

The decision as to what to do under such circumstances is obviously a matter of business judgment,—to determine what the trend of the business would be and how much tobacco and what grades should be purchased.

I am going to suggest that a very good test of the validity of the plaintiff's position would be if he had been a stockholder of the Axton-Fisher Tobacco Company in September 1934, and had sought to enjoin the management from arranging for the purchase of the eight million pounds of Bright tobaccos which are involved in this proceeding, and I put this question to myself: "Is it conceivable that any court would have entertained such an application?"

It seems to me that it is wholly inconceivable, and that no plaintiff would have even dared to have made such an effort under the circumstances here shown. Certainly if he had done it he would have been promptly dismissed by whatever corresponds to a chancellor in Kentucky.

In dealing with the principle that would have been involved in such an application, I must, in the absence of proof to the contrary, assume that the principle governing it would be the same in Kentucky as in New York State, and Judge Peckham, of our Court of Appeals—afterwards Mr. Justice Peckham of the Supreme Court—said in Gamble v. Queens County Water Company et al., 123 N.Y. 91, at page 99, 25 N.E. 201, at page 202, 9 L.R.A. 527: "To warrant the interposition of the court in favor of the minority shareholders in a corporation or joint stock association, as against the contemplated action of the majority, where such action is within the corporate powers, a case must be made out which plainly shows that such action is so far opposed to the true interests of the corporation itself as to lead to the clear inference that no one thus acting could have been influenced by any honest desire to secure such interests, but that he must have acted with an intent to subserve some outside purpose, regardless of the consequences to the company, and in a manner inconsistent with its interests. Otherwise the court might be called upon to balance probabilities of profitable results to arise from the carrying out of the one or the other of different plans proposed by or on behalf of different shareholders in a corporation, and to decree the adoption of that line of policy which seemed to it to promise the best results, or at least to enjoin the carrying out of the opposite policy. This is no business for any court to follow."

B. The proofs established beyond peradventure that because of the conditions of the Axton-Fisher Company business, it was es-

sential to purchase a large amount of tobacco and that the methods under which it was purchased were wholly normal, proper methods for the purchase of tobacco in the tobacco markets which had been going on for years, as I understand it, in the same way.

Now, supposing the personal defendants made a mistake and bought a little too much tobacco. That does not make them liable. Everybody makes mistakes, and I suppose one of the easiest mistakes in the world to make, and one of the mistakes that was made all over the United States in 1929, for example, and later on, too, was in having overloaded inventories.

Most of the 1934 crop of Bright tobaccos have been used, although some is still on hand and will be used. Consequently, it still has a substantial value to the corporation.

The plaintiff's charge that the defendants negligently purchased far too much Bright tobacco of the fourth grade in 1934 is not made out.

I find that they were wholly justified in making the purchase.

There has been much evidence of various kinds adduced here and many exhibits put in evidence. I think that the summary of the evidence by Mr. Barham which I listened to yesterday, March 14th, was extraordinarily helpful as showing the necessary appropriateness of the purchases of 1934 tobaccos. Mr. Barham's evidence, together with some of the exhibits, was conveniently summarized for me by the defendants' attorney, and this summary is wholly persuasive of the propriety of the purchases that were then made, irrespective of whether they have now all been used up or not.

Mr. Barham was one of the best witnesses whom I have ever had before me, and I adopt his evidence, for it must be remembered that we are dealing with expectables of the corporation during the 1934 tobacco buying season as viewed by Mr. Wood Axton, who was the purchasing expert on the spot.

The findings of fact should cover the summary made by Mr. Barham.

C. I turn now to the basis of damages claimed by the plaintiff which are not now material owing to my decision on the merits, but which had much consideration at the trial.

Because in the year 1934 the prices of Bright tobaccos were high, the plaintiff chose to isolate certain 1934 Bright tobacco purchases for his attack on the individual defendants and to claim that these purchases were made at prices above the market.

Now there has been a very interesting evolution as to the plaintiff's claim for damages since the trial started.

As I mentioned above, at the beginning of the trial, the claim for damages was for as specific a sum as is imaginable, namely, $756,459.41. This sum was arrived at by taking the price at which the tobaccos complained of were purchased and deducting therefrom a general average of the market prices for 1934 tobacco of the types in question given by the United States Government in a report of the Department of Agriculture.

That was the basis of the plaintiff's claim.

I refused to admit that that was a correct basis of the claim and I excluded the report of the Department of Agriculture from evidence.

The reason I excluded this report is that it appears from the evidence that green tobacco is always purchased, at different times and places, at auction—with free competition open to all the world—on the floors of warehouses which, I suppose, are mostly owned by farmers or cooperatives. I find it hard to imagine how, under such circumstances, one could buy at auction above the market. Certainly there is not any proof whatever in this cause to support any contention that there was anything in the auctions which made them otherwise than representative of the actual tobacco market for 1934.

Indeed, it was testified that all the large tobacco companies, such as the makers of Camel, Lucky Strike, Chesterfield, Old Gold, etc., cigarettes, had their representatives buying at the same time and at the same auctions in which the Axton-Fisher Company bought its tobaccos.

Consequently, I told the plaintiff I did not see how he was going to make out damages on this basis because it certainly is absolutely impossible to show on the proofs in this record that when you buy tobacco at auction you have bought it above the market existing at the time and place of purchase.

To emphasize this situation a little further, for the sake of any other court to which this cause may go, the point of it all, as it seems to me, is this:

The 1934 tobacco was bought by Axton-Fisher, as I ventured at the trial to describe

it, in a granulated fashion, namely, it was not all bought at one place, at one time, but was picked up at auction in different markets, at different places, and at different times. That is the way the tobacco market for green tobacco is handled.

There is not any evidence whatever to show that there was a single purchase above the market price, and I suppose that claim can now be swept aside. But I want to make it very clear and to emphasize the doctrine as absolutely settled that, the market price of a commodity in the place and at the time when it is bought is what controls, even on such a question as just compensation when the United States is sued for the requisition of such commodity. United States v. New River Collieries, 262 U.S. 341, 43 S.Ct. 565, 67 L.Ed. 1014.

I might mention here also that, as I understand it, the plaintiff is now contending that all the 04H tobacco, which was the fourth grade, according to the Axton-Fisher Tobacco Company's method of grading, was improvidently bought. He says that the expense of that excess purchase of fourth grade was $438,739.94, and he now claims as his damages, instead of the original sum of $756,459.41, the more modest sum of $139,-381.47. This is made up of the carrying charges of the 04H tobacco, and there is not included in the plaintiff's claim for damages the cost of the 04H tobacco purchased which he says was improvidently in excess of the Axton-Fisher requirements.

One of the difficulties with the application of this measure of damages—aside from my decision for the defendants on the merits—is that there is no basis whatever in the record for fixing any time when a duty arose on the defendants' part to get rid of the tobacco and its carrying charges.

D. I see nothing in the plaintiff's case from any standpoint. Indeed, if there were, corporate life would become almost impossible and courts would be overwhelmed with business details.

E. There has been a great deal of evidence taken throughout this cause which I suppose will be submitted to me in the form of findings of fact when the proposed findings of fact and conclusions of law are given to me.

The findings of fact will govern all the evidence with regard to the purchase by the Standard Commercial Tobacco Company, of which Mr. Kehaya was the president, of the controlling stock of the Axton-Fisher Tobacco Company from the Axtons who owned it up to 1936. I use "the Axtons" generically as including Mr. Wood Axton's estate, for he, I think, was the man —if the present company will pardon my saying so,—who was the genius of the Axton-Fisher Tobacco Company, the man who had really created what had started out as a very small business, into what became such a big business, that it began to attract possible purchasers from outside Louisville.

There was a great deal of evidence given on the subject of conferences with Mr. Kehaya at which Mr. Woodward was present, and the evidence of the two men is in many respects antithetic. Well, I believe Mr. Woodward,—the Louisville attorney for Axton-Fisher—in all those differences.

I think that this has really been quite an extraordinary, and interesting case to try. I always regard a non-jury case as an adventure and an education combined.

F. This cause and the experiences of the Axtons with Mr. Kehaya remind me of a legal motto which I have had occasion to use only once before and then in quite a different connection. It is caveat venditor, —let the seller beware.

VI. In pursuance of Rule 52(a) of the Rules of Civil Procedure, the attorneys for the defendants must prepare in accordance with this opinion and submit to me through the Clerk's office findings of ultimate facts and the conclusions of law herein indicated.

In the findings of fact, I shall expect the defendants' attorneys to supplement anything I have mentioned here as they see fit, in order that there may be a full record of the situation involved in this cause, and that the juridical result of this very carefully tried cause may be fully preserved for such use as may be necessary hereafter.

All proposed findings of fact and conclusions of law must be submitted to me typed in triple spacing so that I may conveniently correct them if I wish to do so.

Attorneys for the defendants must give five days' notice of their proposed findings of fact and conclusions of law to the attorney for the plaintiff, Judge William Harmon Black.

In submitting his findings of fact, the attorneys for the defendants must also submit a short memorandum in a separate cover— I want this perfectly clear—and bound on the left side so that it is like a book, and I can read it conveniently. In it defendants' attorneys must indicate the pages of the evidence or exhibits on which each finding

proposed by them is based. This is a very simple matter as one is making up the findings, and it will make it possible for me to look up any question about which I may be in doubt, because it is almost impossible, as I go from case to case, to remember details, especially in a case of this kind which has had so many.

The attorneys for the plaintiff, if they are so advised, may on the return day of such notice of findings of fact and conclusions of law submit to me and serve on' the defendants' attorneys any criticisms of the findings of fact proposed by the latter.

As under Rule 52(a) only findings of fact and conclusions of law which I sign will be filed as part of the record herein, I suggest this course for the plaintiff's attorney because counter findings of fact will not avail him aught. He must take his objections, if any, to my findings of fact and conclusions of law by way of appropriate assignments of error on any appeal which he may take.

Now a word more. The taxable disbursements above referred to by me will include the per diem subsistence whilst in attendance on the trial of all out-of-town witnesses who have been called to testify. See Title 28 United States Code, Sections 600a and 600d, 28 U.S.C.A. §§ 600a, 600d.

I think that it might be a wise suggestion, in order to prevent any difficulty in taxation of disbursements and allowances, that the facts needed under the statute just cited, instead of being first proved by an affidavit before the Clerk, should be proved by an affidavit annexed to the proposed findings of fact dealing with all the witnesses who came here from out of town and testified.

The findings of fact may also include a statement regarding the amount of the bond given in the State Court on the attachment and have annexed a true copy thereof, although any ancillary proceedings thereunder must certainly await final judgment. In connection with the bond, the attention of counsel is called to Thropp v. Erb, 255 N.Y. 75, 174 N.E. 67, 71 A.L.R. 1455.

VII. After the findings of fact and conclusions of law have been signed by me, and the costs, disbursements and allowances have been taxed, a final judgment for the defendants in accordance herewith, may be submitted to me through the Clerk's office for my signature.