Annie **PHILLIP**, Administratrix of the Estate of Augustus J. Phillip, Deceased

v.

**UNITED STATES LINES COMPANY.**

Civ. A. No. 29308.

United States District Court
E. D. Pennsylvania.
March 4, 1965.

Wilfred R. Lorry, Philadelphia, Pa., for plaintiff.

Harrison G. Kildare, Philadelphia, Pa., for defendant.

VAN DUSEN, District Judge.

This case is before the court upon the application of the plaintiff, Annie Phillip, Administratrix of the Estate of Augustus J. Phillip, deceased, for a partial new trial on the issue of punitive damages (Document 33).

This action was brought by Annie Phillip, as widow and personal representative of Augustus Phillip, a member of the crew of defendant's vessel, "American Builder." The vessel was at sea at the time of such death. The case was tried before the undersigned and recovery was sought under the Jones Act, 46 U.S.C.A. § 688, which incorporates provisions of the Federal Employers' Liability Act, 45 U.S.C.A. §§ 51 and 59. On October 8, 1964, the jury returned a verdict in favor of the plaintiff in the sum of $37,000. (Document 31.)

The plaintiff claimed punitive damages in the Complaint, and at the trial asked that this issue be submitted to the jury. This request was objected to by the defendant and the objection was sustained by the court (N.T. 572, 573, 579). The plaintiff objected to the court's failure to charge on punitive damages (N.T. 635) and the plaintiff filed this post-trial motion for a partial new trial on the issue of punitive damages (Document 33).

Defendant also filed a post-trial motion for a judgment n. o. v. or for a new trial (Document 36), but this was subsequently withdrawn (Document 45). As stated in the plaintiff's brief at page 1 (Document 50), the only issue before the court is whether, under the facts of the instant case and the applicable law, the issue of punitive damages should have been submitted to the jury.

At about 7 P.M. on the evening of February 7, 1961, while the defendant's vessel was in the English Channel, the deceased Phillip suddenly went berserk. He appeared in a passageway wearing a ceremonial robe and holding a piece of slag in his hand. His outburst, which injured members of the crew, was so violent that it became necessary to overpower him. He was taken to the ship's hospital room, where his hands were shackled with handcuffs to the sides of a bunk and his feet were tied by a rope to the lower end of the bunk. No sedative was administered to him and the vessel was not diverted to any shoreside medical facility, but continued on its course along the French Coast until it entered the Gironde River on the morning of February 9, 1961. Crew members stood watch outside Phillip's room with the door open from 8 P.M. on February 7, 1961, until 9 A.M. on February 9, 1961, when the ship reached its destination at Bassens (near Bordeaux), France (see Exhibit P-8).

Shortly after 8 A.M. on February 9, 1961, one of the guards became concerned over Phillip's lack of movement while lying in his bunk. Phillip at this time had a blanket over his head which stretched down covering most of his body. The guard eventually lifted the blanket from over Phillip's head and saw strips of blanket stuffed in his mouth and nostrils. Not being able to detect breathing, the guard raised an alarm between 8 and 9 A.M. on February 9, which brought the ship's second officer, who removed the strips of blanket from Phillip's mouth. An attempt was made to revive Phillip by artificial respiration, which proved useless. Since the ship

was just docking at Bassens, a shore doctor was secured and he certified Phillip dead at 9:45 A.M., attributing death to violent delirium (Document 42, N.T. 406).

■ The defendant asserted, both in its brief and at oral argument, that punitive damages are not recoverable in the instant case, first, because recovery under the Jones Act is limited to compensatory damages and, second, because punitive damages may not be imposed against a corporate, ship-operating employer unless such employer was involved directly in the wrongful acts of his servant or agent by knowledge, participation or ratification. While these two issues were ably briefed and argued by both counsel, it is not necessary to decide that such a corporate shipowner may never be held liable for punitive damages under the Jones Act,[1] since it is clear that plaintiff cannot recover on the facts of this case construed in the most favorable light for plaintiff.

" 'Punitive damages' are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct." Restatement of Torts, § 908(1).

"Punitive damages will be allowed for torts that are committed wilfully, maliciously, or so carelessly as to indicate wanton disregard of the rights of the party injured. Such conduct must appear affirmatively in the evidence." Thompson v. Swank, 317 Pa. 158, 159, 176 A. 211 (1934).

See, also, Huges v. Babcock, 349 Pa. 475, 37 A.2d 498 (1944); Adelman v. Rosenbaum, 133 Pa.Super. 386, 3 A.2d 5 (1938), and cases cited therein.[2]

■■ Punitive damages will only be awarded for outrageous conduct, i. e., for acts done with a bad motive or done with a conscious or reckless indifference to the interests of others. Restatement of Torts, § 908, comment (b). It is improper to submit to the determination of the jury the issue of punitive damages in the absence of evidence of the requisite elements for the application of the rule. See, for example, Hoffman v. Berwind White C. Min. Co., 265 Pa. 476, 482–483, 109 A. 234 (1920).

In the Restatement of Torts, § 908, comment (d), this language is used:

"It is error for the trier of fact * * * to award punitive damages where there has been no bad motive or wanton indifference; an instruction that the jury can award punitive damages in such a case followed by a verdict which, from its size, indicates that punitive damages have been awarded is ground for a new trial."

■ On the facts of the instant case, it would have been error if the jury had awarded punitive damages to plaintiff. There was insufficient evidence to justify a finding that decedent's death was the result of (1) a malicious motive of, or

1. Cf. Basista v. Weir (3rd Cir.) 340 F.2d 74, Opinion of 1/8/65, in which the court concluded that the plaintiff was entitled to recover punitive damages under § 1 of the Civil Rights Act of 1871, 42 U.S.C.A. § 1983. In this opinion, the court stated: "We are also of the view that the federal law permits the recovery of exemplary or punitive damages" (340 F. 2d p. 87).

2. The definition of that degree of negligence requisite to the recovery of punitive damages, as above cited from the Restatement and the Pennsylvania cases, is in accord with federal law or "the general common law" existent prior to Erie R. R. v. Tompkins, 304 U.S. 64,

58 S.Ct. 817, 82 L.Ed. 1188 (1938). See, for example, Milwaukee, etc. R. R. Co. v. Arms et al., 91 U.S. 489, at page 493, 23 L.Ed. 374 (1875), where the court said:

"Redress commensurate to such [personal] injuries should be afforded. In ascertaining its extent, the jury may consider all the facts which relate to the wrongful act of the defendant, and its consequences to the plaintiff; but they are not at liberty to go farther, unless it was done wilfully, or was the result of that reckless indifference to the rights of others which is equivalent to an intentional violation of them."

(2) a conscious or reckless indifference to the interests of the decedent by, the defendant.

Plaintiff claims that the following evidence would justify a jury's finding intentional misconduct or reckless disregard of Mr. Phillip's rights and awarding punitive damages:

(1) Testimony that Phillip was found gagged to death with strips of blanket or cloth stuffed in his mouth and nostrils (Flynn dep., Doc. 22, pp. 14–15; Montero dep., Doc. 23, pp. 9–10).

The question of whether or not Phillip died from suffocation due to strips of wadding blocking his respiratory system was never resolved at trial. The medical testimony elicited from the medical experts varied widely on the cause of death. The most favorable medical testimony to the plaintiff was that Phillip died from exhaustion and that this might have been from suffocation (Dr. Gelfand, Document 34, N.T. 19–21).[3] According to this testimony, from a medical standpoint suffocation will not give rise to any pathological change, and, therefore, a post-mortem examination cannot reveal that an individual died from suffocation, as opposed to exhaustion. The defendant's doctors rejected exhaustion as a cause of death (Document 47: Dr. Spellman, pp. 8 & 38; Dr. Keyes, pp. 51–53). Further, the evidence cited in the above paragraph that the deceased was found with strips of cloth stuffed in his mouth and nostrils was refuted by the testimony of Dr. Spellman, who performed an autopsy and found no traces of fuzz or any similar substance in the deceased's throat (Document 47, p. 14). The blanket that covered the body of the deceased at the time of the discovery of his death was introduced into evidence and it showed no sign of having been torn.

Even assuming that taking the above evidence in the light most favorable to the plaintiff, a jury might reasonably find that Phillip died from suffocation due to wadding stuffed in his mouth and nostrils, it could not reasonably further find, on the evidence in this record, that this was the result of any malicious or reckless misconduct on the defendant's behalf. No evidence was offered at the trial that Phillip's death was the result of any foul play on the part of the crew or that any crew member ever even bore any ill feelings against him. Plaintiff attempts to raise the inference of malice through the circumstantial evidence that Phillip's guard, Edwin Susol, who was on watch just prior to the discovery of his death, was from Jacksonville, Florida, and, as a southerner, might bear a natural dislike for Phillip, a Negro. There is no other evidence on the record to support such an inference, and this fact standing alone cannot plausibly lead to a conclusion that Susol was involved in any foul play against Phillip. Susol's testimony at his deposition does not indicate any ill feeling toward the deceased. He stated that he was not aware of any abnormality in Phillip's behavior prior to February 7, 1961, because he had never had any contact with him (Document 20, pp. 97, 98, 105). He further testified that he, together with another guard, stood his watch and that they alternated in stand-

3. It is noted that Dr. Gelfand did not state that, in his opinion, suffocation was a cause of death. He used this language at page 19 of Document 34:
   "It is my opinion that if such were the case that in addition to exhaustion that you would have to entertain the problem of suffocation; * * * suffocation by denial of the access of air to his lungs through the nostrils or the mouth has to be considered in addition to exhaustion."
   Again, at page 21, he testified:

"THE COURT: And I take it that all you are able to tell us with what you have been told now is that there would be the *problem* of this being another cause of death?
"THE WITNESS: An additional factor, yes.
"THE COURT: An additional causative factor?
"THE WITNESS: Yes, sir." (Emphasis supplied.)
Also, the evidence did not exclude the possibility that the decedent placed the pieces of cloth in his nostrils or mouth.

ing that watch at half hour intervals from 4 A.M. to 8 A.M. on February 9, 1961 (id. at 100). Taking the evidence on the record as a whole, including Susol's deposition, a reasonable jury could not find that Susol or any other crew member was involved in any deliberate wrongdoing related to Phillip's death for which defendant was responsible.

The plaintiff raises two other instances which she alleges warrant a jury's awarding punitive damages, and which will be considered together.

(2) The fact that Phillip was never sedated during the whole period of his delirium [4].

(3) The fact that no attempt to secure medical advice or assistance was ever made after the deceased's initial outburst and continued delirium.

A jury might find negligence, and possibly in the instant case did base their finding of negligence, on the action or lack of action taken in regard to Phillip's condition by those onboard the defendant's ship. However, the character of the conduct of the officers and crew of the American Builder could not be found by a jury to rise to that of outrageous conduct, bad motive, or wanton indifference to the interests of the decedent.

Dr. J. W. Spellman testified that if he were a physician recommending to a lay crew on the prompt treatment of a seaman of the size, age and musculature of Phillip who was violently psychotic, he would recommend restraint and that forcible administration of an anesthetic might be hazardous because of further damage to the patient (Document 47, Dr. Spellman, N.T. 20–22). Dr. Baldwin Keyes, a noted specialist in neurology and psychiatry, testified in answer to a question as to what treatment was indicated for Phillip at the time of his psychotic outburst:

"Well, during the psychotic upset, violent outbreak of this kind, you first want rest, and the best rest is restraint. And we use it right straight along in all of our hospitals in the city. * * * You sometimes keep a patient in restraint for some days, rather than hit him too hard with drugs that might be dangerous to him if he is physically too sick to take them. But I think they did the right thing in placing him in restraint." (Document 47, Dr. Keyes, N.T. 46; see, also, page 53.)

Dr. Keyes further testified, after explanation of Phillip's condition, that the crew members should not have forced the decedent to submit to a hypodermic needle (Document 47, p. 48) and, in answer to a question on the risk of forcing a patient to submit to a hypodermic; stated:

"Well, you can injure a man who is already sick, as this man proved later to be, by fighting with him, forcing him into a combative area. You can break an arm, break a leg, break off the needle; you can do a lot of things." (Id., at 48.)

Dr. Keyes further testified, in relation to a question as to his opinion as to whether sedation was indicated for Phillip after the initial outburst had passed:

"Not particularly. I think he was quieting down. The wise thing to do was to let him quiet down and not disturb him with too much. * * *" (Id., at 50) [5]

4. When the ship's crew approached the decedent with a hypodermic to inject a sedative, he became extremely violent, yelling: "Don't give me that, don't inject that drug in my body" (Document 21, p. 95, and N. T. 365).

5. Dr. Keyes also testified that he thought the ship's crew "did very well with" the decedent, using this language at page 53 of Document 47:

"I feel that because they did the proper thing in first putting him on restraint, letting him lie down and put restraint on him. This required a certain amount of physical activity and a certain amount of effort on their part and violence, therefore, but by putting him under restraint immediately you had an enforced rest, and soon after this when they left him alone, they stopped offering him sedation, he quiet-

The above medical testimony indicates that the course of conduct taken in regard to Phillip cannot be found to be so careless as to indicate a wanton disregard of his rights. After his initial outburst, Phillip was restrained by being shackled to a bunk in the hospital room. An attempt was made to orally sedate the man, but this proved futile when he knocked the cup across the room (Document 21, p. 22, and N.T. 395; and N.T. 464). A hypodermic was prepared, but was never injected because Phillip's reaction was so violent that the officers were afraid to give him the injection (Document 21, p. 95, N.T. 365, and N.T. 465). Thus, sedation was considered for Phillip and rejected. It may have been negligent to reject this procedure, but in view of the medical testimony quoted in the previous paragraph, such cannot be considered outrageous conduct. Further, in view of the fact that both of these doctors agreed with the treatment given to Phillip after the onset of his delirium, the fact that medical advice was never sought cannot be considered as establishing a basis for the recovery of punitive damages either.

There is affirmative evidence on the record that Phillip's interests were being looked out for, such as the fact that the guard was set up around him on a 24-hour basis (see Exhibit P–8 and N.T. 143) in case he needed any assistance, and the fact that a radio message was sent by Captain Bell to Bordeaux instructing the defendant's agents that a mentally-disturbed crew member was onboard and requesting a doctor for him immediately upon docking (Bell, N.T. 314).[6] The above are not the acts of one who is wantonly disregarding another's rights. In retrospect, it might be said that more should or could have been done to aid or alleviate Phillip's condition, but this alone is not enough to establish the requisite conduct upon which punitive damages may be recovered.[7]

Plaintiff's Motion for a Partial New Trial (Document 33) on the issue of punitive damages will be denied.[8]

---

ed down and settled. And I think the restraint functioned as a rest medium more, probably, than would have been forcing of medication that he was combating, and frightening him."

6. The Captain was justified in considering the risk to his crew and the vessel if he attempted to make port on February 7 or 8 with the existing bad weather (N. T. 190–192) and engine trouble (N. T. 192–3), resulting in "severe loss of maneuverability of the vessel" (N. T. 193). He testified at N. T. 206:

"I don't feel that the weather conditions—the weather and sea would have been on my beam, which would have put my vessel in the trough, in a very dangerous rolling position; and as I have previously testified, I was operating at approximately one-half power. I definitely don't feel that I could have safely attempted to divert the ship."

Also, he testified at N. T. 304:

"I didn't feel that another doctor could offer anything at the moment. The patient had passed the violent stage and had now become passive. The only thing that I could have reported to medical authorities was that a man had become violent and was now calm. I didn't feel that anyone could offer any further suggestions for handling the case."

7. The briefs filed by the parties have been placed in the Clerk's filed as Documents Nos. 50 to 52.

8. The testimony of plaintiff's doctors (Dr. Dillon and Dr. Gelfand) that a sedative should have been administered by force (Document 34, N. T. 13–15, 33, and 53–57; and Document 35, N. T. 13–15, 19–21, and 28–33) and the testimony of Captain Higbee that instructions should have been received from shore, and that the ship could easily have been diverted to shore, have all been considered by the undersigned but, reading the record as a whole, the requisite evidence for a finding that punitive damages should have been awarded is absent.

In view of the testimony of Drs. Spellman and Keyes, which agreed with the treatment given Phillip by the ship's crew, and also in view of Dr. Spellman's testimony (Document 47, N. T. 23–38) upon being shown "The Ship's Medicine Chest and First Aid at Sea" (Exhibit P–10), an argument that punitive damages should be awarded because the defendant's crew did not follow the procedure required by this book, cannot be supported on this record.

## ORDER

And now, March 4, 1965, it is ordered that the motion for partial new trial on issue of punitive damages (Document 33) is denied.