**Gary AHRENS, b/n/f Leigh Ahrens and Leigh Ahrens and Fred Ahrens**

v.

**Fred KATZ, Rolo Hardin, Sheldon Baum, A.B. Caldwell, R.B. Holstein, A.R. Haight, Doctors Hospital of Tucker, Herbert L. Greenwald, and Bi-County Pediatrics, Inc.**

**Gary AHRENS, b/n/f Leigh Ahrens and Leigh Ahrens and Fred Ahrens**

v.

**DOCTORS HOSPITAL OF TUCKER, INC.**

**Civ. Nos. C81–1309, C84–858.**

United States District Court, N.D. Georgia, Atlanta Division.

Oct. 22, 1984.

William Q. Bird, Andrew M. Scherffius, Irwin M. Ellerin, Bird, Scherffius & Rumsey, Atlanta, Ga., for plaintiffs.

Robert G. Tanner, James T. Perry, Atlanta, Ga., for Katz, Hardin and Caldwell.

David A. Handley, James C. Huckaby, Alan Kyman, Gambrell & Russell, Atlanta, Ga., for Haight.

W.E. Zachary, Sr., Zachary & Segraves, Decatur, Ga., for Doctors Hospital of Tucker.

James S. Owens, Nall & Miller, Atlanta, Ga., for Greenwald and Bi-County Pediatrics.

## MEMORANDUM OPINION

ORINDA D. EVANS, District Judge.

By order entered September 14, 1984, the court denied Plaintiffs' Petition in Equity as amended in Civil No. C84–858 above. The purpose of this memorandum opinion is to set forth the court's reasons for denying the Petition in Equity as amended.

The Petition is brought under the court's diversity jurisdiction. Plaintiffs are asking the court to set aside or deny res judicata effect to a 1982 judgment entered against them and in favor of Doctors Hospital of Tucker, Inc. by the Superior Court of De-Kalb County, Georgia. The grounds asserted are fraud and mutual mistake. Plaintiffs seek to avoid the bar of the judgment in order to prosecute negligence claims against the Hospital in Civil No. C81–1309 above.

A federal district court may entertain a diversity-based suit in equity to set aside or deny res judicata effect to a state court judgment. *See* Vol. 7, Moore's Federal Practice, ¶ 60.37[3] (2d Ed.). The principles of *Erie v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), require that the court apply the law of the state which rendered the judgment.[1]

---

1. Both the Federal Rules of Civil Procedure and the Official Code of Georgia Annotated provide for an independent suit in equity to obtain relief from judgments procured by fraud or mistake. Although the Georgia statute is more specific in stating that an independent action to set aside a judgment may be based on allegations of fraud or mistake, it is clear that the federal and Georgia statutes provide parallel remedies. *Cf.* O.C.G.A. § 9–11–60(e); Rule 60(b), F.R.Civ.P.

A number of Georgia statutes and decisions are relevant to determination of the proper standard of proof under Georgia law. O.C.G.A. § 23–2–21 provides in pertinent part:

> (a) A mistake relievable in equity is some unintentional act, omission, or error arising from ignorance, surprise, imposition, or misplaced confidence.
>
> \* \* \* \* \* \*
>
> (c) The power to relieve mistakes—shall be exercised with caution, and to justify it the evidence shall be *clear, unequivocal, and decisive* as to the mistake. (Emphasis supplied).

O.C.G.A. § 23–2–57 provides:

> Fraud may not be presumed but, being in itself subtle, slight circumstances may be sufficient to carry conviction of its existence.

The Georgia Supreme Court has held however that "slight circumstances" are insufficient to prove fraud in a suit to set aside a judgment. *Leventhal v. Citizens & Southern National Bank*, 249 Ga. 390, 291 S.E.2d 222 (1982). The Court did not state precisely what the applicable standard is in that case, but common sense dictates that evidence of fraud sufficient to reopen a judgment should be no less clear or unequivocal than that required to reopen based on mistake.

In *Carroll v. Craig*, 214 Ga. 257, 104 S.E.2d 215 (1958), the Georgia Supreme Court held that where a party sought by petition in equity to reform a deed, it was error to merely instruct the jury that petitioner could prevail based on a preponderance of the evidence. However, in *Fidelity v. State Highway Dept.*, 174 Ga. 443, 163 S.E. 174 (1932), a similar case, the court held that a charge defining the burden of proof as that of a preponderance of the evidence but referring to the requirement of "clear, unequivocal and decisive" evidence was not erroneous.

■ Interpreting the foregoing Georgia statutes and holdings, this court finds that Georgia law requires that Plaintiffs prove their equitable claims by something more than a mere preponderance of evidence. The evidence must preponderate in Plaintiffs' favor, but it must also be of "clear, unequivocal and decisive" quality. This standard applies to Plaintiffs' claims to reopen based on alleged fraud and also on alleged mistake.

Having established the relevant standard of proof, the court now turns to a review of the evidence, and findings of fact.

Plaintiffs are seeking denial of res judicata effect to the state judgment on alternative grounds. First, they contend that the Hospital's alleged suppression of a part of Gary Ahrens' hospital chart, and a nurse's obliteration and subsequent alteration of a part of the chart, worked a fraud on the Superior Court of DeKalb County, which granted the Hospital's motion for summary judgment in the allegedly erroneous belief that the chart was true and correct, whereas it in fact had been fraudulently altered. Alternatively, Plaintiffs contend that both they and the Hospital proceeded in the DeKalb County action in the mistaken belief that Gary's hospital chart was complete and correct, when in fact it was not.

Plaintiffs' claims of fraud and mistake received their impetus from an interview by Plaintiffs' counsel of Dr. Terry Gerard in the spring of 1984. At that interview Dr. Gerard, who had been an intern at Doctors Hospital at the time of Gary's birth, signed an affidavit stating that he had placed certain progress notes in the child's hospital chart which are no longer there. He said these entries were critical of Dr. Greenwald, a Defendant in Civil No. C81–1309. Primarily, he said the notes documented his unsuccessful efforts to get Dr. Greenwald to come to the hospital to treat Gary.

Following the interview with Dr. Gerard, Plaintiffs' counsel discovered "whiteouts" in Gary Ahrens' hospital chart which also are alleged to have been part of a fraudulent scheme.

The court will first deal with the alleged missing progress notes and then will deal with the whiteouts.

## A. *The Missing Progress Notes*

■ Fundamental to Plaintiffs' claims for relief under both fraud and mistake theories is their assertion that Dr. Gerard created progress notes which he placed in Gary Ahrens' file. There is no documentary evidence to support this assertion. The only testimonial evidence which directly addresses the contention is that of Dr. Gerard. The Hospital's witnesses neither confirm nor deny that the progress notes ever existed.

Dr. Gerard testified that during the afternoon of Gary's birth (July 12, 1979), he was the intern on duty. Three infants were in the nursery under his care—Gary Ahrens, Jeffrey Ahrens, and Misty George. He said he made notes during the afternoon on a pad and that that evening, he transferred these notes onto "Progress Record" forms in Gary Ahrens' and Misty George's hospital charts. The charts do not contain any such notes however. Dr. Gerard testified that he made no progress notes with respect to Gary Ahrens' twin brother, Jeffrey.[2] Jeffrey Ahrens' post-delivery course was uneventful, but Misty George had hyaline membrane disease, and Gary Ahrens developed hypoglycemia.

Pursuant to a request made by the pediatrician[3] for the George and Ahrens infants, Misty George and Gary Ahrens were picked up by a transport team[4] on the evening of July 12 and taken to special high-risk nurseries at Grady and Egleston Hospitals respectively. Standard procedure in such cases is to send a copy of the transported infant's chart with him to the new hospital, but no copy was sent with Gary Ahrens to Egleston Hospital. Gary Ahrens' hospital chart does not contain a parental authorization for a copy of his chart to be sent. Misty George's chart, however, reflects a signed consent for a copy of her chart to be sent to Grady Hospital on July 12, 1979. No evidence was presented addressing whether Grady has a copy of Misty George's file, and if so, whether it contains any progress notes by Dr. Gerard.

A few days after Gary Ahrens' transfer to Egleston Hospital, he developed necrotizing enterocolitis which required removal of his colon. The reason necrotizing enterocolitis developed is a major issue in Civil No. C81–1309. Plaintiffs have alleged a number of contributing causes. For one thing, they allege that Gary's premature delivery by elective cesarean section was a causal factor in his developing hypoglycemia. The hypoglycemia in turn allegedly caused or contributed to the necrotizing enterocolitis. In addition, Plaintiffs allege that the pediatricians responsible for Gary's care—Dr. Greenwald and Dr. Nickelsen—negligently failed to be present in the nursery on the afternoon following his birth. This failure is alleged to have caused a delay in treating his hypoglycemia, thus contributing to the later development of necrotizing enterocolitis.

Finally, there is evidence that when Dr. Gerard inserted an umbilical vein catheter in Gary while caring for him, that the catheter was misplaced and became curled up inside the child's liver. Dr. Greenwald, a defendant in Civil No. C81–1309, contends that he instructed Dr. Gerard to give oral feedings of glucose only. Dr. Greenwald's contention is that Gary's hypoglycemia was not severe enough to require intravenous glucose, and that Dr. Gerard acted improperly when he allegedly decided on his own to administer intravenous glucose.

---

**2.** There is a Progress Record form in Jeffrey Ahrens' chart which contains two entries dated July 13 and 16, 1979 signed by Dr. Nickelsen, the attending pediatrician. Dr. Gerard testified it was unnecessary for him to make progress notes on Jeffrey Ahrens, because he was not having any problems. There is no Progress Record form at all in the charts of either Gary Ahrens or Misty George. Witnesses for both sides stated this was not unusual in a case where the patient was at the hospital for less than a day.

**3.** The request was by Dr. Neil Nickelsen, partner of Dr. Greenwald.

**4.** The transport team was called to pick up Misty George. However, when they arrived mid-evening at the Hospital, Dr. Nickelsen asked them to transfer Gary Ahrens also.

Since there is an absence of documentary evidence and no testimonial evidence except Dr. Gerard's affirming his creation of progress notes on July 12, 1979, the fate of the petition in equity depends entirely on Dr. Gerard's credibility.

Dr. Gerard is not a disinterested witness. Rather, he participated in Gary Ahrens' care during a critical time following the child's birth. He admits that as the intern on duty, he had the obligation to place appropriate progress notes in the hospital charts of his patients. Yet, there is no tangible evidence that he put any progress notes in the charts of any of the three patients he treated.

Dr. Gerard's stated perspective on the events of July 12 is that until he inserted the umbilical vein catheter in Gary Ahrens (at about 6:00 p.m.), the child was in a great deal of distress. He explicitly testified that Gary was lethargic and that he had to be fed through a nasogastric tube. This particular part of his testimony was very unconvincing. Indeed, Dr. Gerard admitted uncertainty as to whether he had reported any lethargy or physical symptoms to the attending pediatrician during their phone conversations. After some equivocation, he testified he probably had told the pediatrician that the child was a "little bit listless." Tr. 69. At another point in his testimony he testified that he was uncertain that he was capable of identifying lethargy in a newborn. Tr. 44. The testimony about the nasogastric tube came in response to leading questions and was unconvincing.

Other evidence contradicted Dr. Gerard's testimony about the lethargy and the nasogastric tube. The nurses' notes in Gary Ahrens' chart do not reflect that he was lethargic or in distress.[5] The notes reflect that Gary was fed orally, not through a nasogastric tube. Further, Sue Peterson— the only nurse who had an independent recollection of the events of July 12—testi-

fied credibly that Gary Ahrens had not been lethargic and that he had been fed orally, not through a nasogastric tube.[6] Dr. Gerard's contrary testimony, therefore, is not credited.

The fact that Dr. Gerard's testimony was impeached in certain respects lessens the court's confidence in his testimony that he placed progress notes in the file which are not now there. Also, the fact that his testimony is uncorroborated, and the fact that he is not disinterested weigh negatively. Thus, the court is unable to find that the evidence is of "clear, unequivocal, and decisive" quality. This failure is fatal to both the fraud and mistake theories.

In addition, the record provides no clear explanation of exactly what Dr. Gerard's alleged progress notes said which would have enabled Plaintiffs to defeat the Hospital's motion for summary judgment in the Superior Court of DeKalb County. The court credits Dr. Gerard's testimony that he was extremely agitated at Dr. Greenwald on the afternoon of July 12, 1979, and further credits his testimony that he told Dr. Greenwald that he should come into the hospital to treat Gary Ahrens. These allegations, however, are not seriously disputed by Dr. Greenwald. Dr. Greenwald's position is that he disagreed with Dr. Gerard about the presence of an emergency. Therefore, even if Dr. Gerard did create progress notes it is unclear exactly how the suppression of these notes altered Plaintiffs' position with respect to their claims, especially their claims against the Hospital.[7] For this additional reason, Plaintiffs' claims of fraud and mistake pertaining to the progress notes are rejected.

### B. *The Whiteouts*

As is stated in the September 7 order, once Dr. Gerard's testimony came to light, Plaintiffs' counsel reviewed Gary Ahrens' original hospital chart and found "white-

---

5. The nurses' notes on the George infant, on the other hand, do reflect a distressed infant.

6. She testified that Misty George had had a nasogastric tube, however.

7. This lack of clarity is discussed in the court's order of September 7, 1984. The amendment to Plaintiffs' Petition filed in response to this order does little to improve the situation.

outs" on certain portions of the nursing notes. The Petition in Equity alleges that these whiteouts were part of a fraudulent scheme to hide relevant facts concerning Gary Ahrens' treatment, or alternatively the cause of a mutual mistake concerning Gary Ahrens' course of treatment.

Analysis of these contentions is simplified by the fact that the parties have determined with x-ray equipment what the original notes said prior to the "whiteouts." The line in the nursing notes which originally said "1628 results of RBS—1628—Dr. Gerard notified—" was changed to delete the intermediate reference to "1628" and to substitute "21%," so that the line as altered now reads: "1628 Results of RBS—21%—Dr. Gerard notified."

Another line in the nursing notes originally read: "1745 Scalp vein I.V. started per Dr. Funk c̄ # needle." This entry was whited out and over that the following entry was made: "1750 glucagon τ mg IM given RAT as ordered. Took and retained 10 cc D5W Has fair suck reflex."

Beth Tiller, the nurse who made the original entries, the "whiteouts," and the "writeovers," testified at the September 13–14 hearing. Her testimony was credible. She stated that the whiteout/writeover procedure was not in accordance with correct nursing standards, and that the proper procedure would have been for her to line through the erroneous material, mark it "error," and then make a correct entry beneath it. She said she could not remember why she had used the whiteout fluid instead. It was clear that she lacked an independent recollection of the events of July 12, 1979, but the nature of the material "whited over," taken in conjunction with other material in the chart, fails to suggest a fraudulent or guilty motive. First, the substitution of the figure of 21% for 1628 was an obvious correction of an inadvertent repetition of the time of day. Secondly, it seems likely that Nurse Tiller made the entry concerning the scalp vein I.V. as Dr. Funk tried to start the I.V. When he failed because the patient's veins were too small, Nurse Tiller decided to change the entry.

The whiteout procedure was improper, but the court again is unable to infer a fraudulent or guilty motive.

Finally, Plaintiffs contend that the whiteouts on the nursing charts resulted in a mutual mistake as to the real content of Gary Ahrens' hospital chart. It is true that counsel for neither side realized until recently that the chart contained "whiteouts" or what was under the "whiteouts." This does not provide a basis for equitable relief from the DeKalb judgment, however, unless the chart misrepresented or omitted a material fact regarding Gary Ahrens' course of treatment. The court finds that it did not. The chart made it clear that there was difficulty in starting an I.V. Specifically, the "Physicians Orders" section of the chart shows an entry by Dr. Gerard as follows: "1730 Dr. Funk to participate in helping get I.V. in child." Immediately under that is the entry "1800 George Page to participate in helping get I.V. in child." Thus, it is readily inferable that Dr. Funk did not start an I.V. Therefore, the whiteout made by Nurse Tiller was not significant to meaningful review of the chart.

For the foregoing reasons, the court finds no fraud or mistake relievable in equity under applicable Georgia law, and the judgment in favor of the Hospital in the Superior Court of DeKalb County is entitled to res judicata effect. Accordingly, the court has by order entered on September 14, 1984, (1) denied the Petition in Equity as amended in Civil No. C84–858, and (2) granted the Hospital's motion for summary judgment in Civil No. C81–1309.