NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0959n.06
No. 10-6077

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Aug 29, 2012**
LEONARD GREEN, Clerk

|  |  |  |
|---|---|---|
| ATLANTIC MUTUAL INSURANCE COMPANY, | ) ) ) | |
| Plaintiff-Appellee, | ) ) | ON APPEAL FROM THE |
| v. | ) ) | UNITED STATES DISTRICT COURT FOR THE WESTERN |
| MICHAEL YATES, | ) ) | DISTRICT OF KENTUCKY |
| Defendant-Appellant. | ) ) | |

Before:  CLAY and KETHLEDGE, Circuit Judges; DOW, District Judge.[*]

DOW, District Judge.  The issues in this case turn on constructions of Kentucky insurance law.  With no facts in dispute, the parties – an insurance company and its policyholder – filed cross-motions for summary judgment.  The district court resolved the dispute in favor of the insurance company.  We affirm.

I.

Starting in 2000, Plaintiff Atlantic Mutual Insurance Co. ("Atlantic") provided Defendant Michael Yates ("Yates") with insurance coverage.  In particular, Atlantic issued to Yates and his family a comprehensive automobile, property, uninsured motorist, and personal umbrella insurance policy (the "Plan").  The policy in force as of 2000 provided auto coverage, including uninsured

---

[*] The Honorable Robert M. Dow, Jr., United States District Judge for the Northern District of Illinois, sitting by designation.

motorist coverage, to two vehicles owned by the Yates family. Under the policy in effect then, Yates paid a premium of $228.00 for $500,000.00 of uninsured motorist ("UM") coverage. As of 2000, Atlantic calculated the premium for UM coverage on a per vehicle basis. As a result, the more vehicles that the insured included on the Plan, the more the insured paid in premium for the coverage.

In 2001, Atlantic changed its method of setting premiums for UM coverage in response to a Kentucky Supreme Court opinion that allowed "stacking" of UM limits where the UM premiums were paid on a "per-vehicle" basis.[1] In an attempt to avoid the consequences of that decision, Atlantic began setting its UM premiums at a constant, per-policy rate, pursuant to which the price for UM coverage is the same regardless of how many vehicles are insured. Under the new rate structure, Yates paid $253.00 for $500,000.00 of UM coverage. Atlantic sent Yates an amended copy of the insurance policy showing this change.

In 2003, Yates renewed his insurance coverage under the Plan. At that time, the Plan divided the premiums for various types of coverage between Yates' two vehicles, clearly indicating the premium assessed for each. Next to "Unins./Underins.," the column for each vehicle contained an asterisk that directed the policyholder to the "Optional Coverages Page." On that page, the Plan stated as follows: "Rates for UM or UM/UIM and added PIP are applied on a per policy basis. The same rate applies regardless of the number of vehicles insured on this policy." It is undisputed that

---

[1] Stacking simply means that an insured can recover the limits of his UM policy for each vehicle he owns. In Yates' case, because his policy covered two vehicles and had a limit of $500,000.00 in UM coverage on each vehicle, Yates could have collected up to $1,000,000.00 on a UM claim under the policy in effect as of 2000.

Yates received a copy of the 2003 Plan.

In addition to automobile coverage, the Plan included an umbrella provision that was designed to protect the Yates family beyond the limits of their underlying insurance coverage and had a total policy limit of $1,000,000.00. Under the heading "**DAMAGES WE WON'T PAY,**" the umbrella provision specifically stated, "**(21) Uninsured/Underinsured Motorists Coverage.** We won't pay for Uninsured/Underinsured Motorists Coverage or No–Fault benefits unless such coverage is specifically shown on the Coverages Page as an Umbrella coverage." The "Coverages Page" did not list UM coverage. Atlantic did not obtain a signed waiver of UM coverage from Yates in relation to the umbrella coverage.

On December 7, 2003, Yates was involved in a motor vehicle accident with an uninsured motorist. As a result of the injuries that he sustained in the accident, Yates incurred more than $1,000,000.00 in medical bills. Atlantic paid its policy limit of $500,000.00 and informed Yates of its position that it owed nothing more. To resolve the lingering coverage dispute, Atlantic filed a complaint for declaratory judgment. Yates claims entitlement to additional UM coverage on two grounds. First, he contends that because his UM insurance covered two vehicles, he should be allowed to "stack" the $500,000.00 limit to obtain a total of $1,000,000.00 in coverage. Second, he asserts that an additional $1,000,000.00 of UM protection should be imputed into his umbrella coverage because Atlantic failed to provide UM coverage under the umbrella provision of the Plan and neglected to obtain a rejection of such coverage in writing.

In the absence of any dispute on the material facts, the parties presented cross motions for summary judgment to the district court. Yates also filed a motion to certify several questions to the

Case No. 10-6077
*Atlantic Mutual Insurance Co. v. Michael Yates*

Kentucky Supreme Court. In a memorandum opinion and order, 2010 WL 890182 (W.D. Ky. Mar. 9, 2010), the district court declined to certify any questions and granted summary judgment for Atlantic Mutual and against Yates. Yates filed a timely motion to alter, amend, or vacate the district court's rulings, which the district court denied. This appeal followed.

## II.

## A.

We review *de novo* the district court's grant of summary judgment. *Pennington v. State Farm Mut. Auto. Ins. Co.*, 553 F.3d 447, 450 (6th Cir. 2009). Summary judgment is proper where, after drawing all reasonable inferences in favor of the non-moving party, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Id.*; *see also* Fed. R. Civ. P. 56©. In considering a motion for summary judgment, the district court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Where, as in this case, jurisdiction exists on the basis of diversity of citizenship, federal courts apply the substantive law of the forum state. *Pennington*, 553 F.3d at 450 (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). The parties agree that Kentucky law governs the insurance contract at issue. In looking to Kentucky law, we "follow the decisions of the state's highest court when that court has addressed the relevant issue." *Talley v. State Farm Fire & Cas. Co.*, 223 F.3d 323, 326 (6th Cir. 2000). In the absence of an on-point decision of the Kentucky Supreme Court, our task is to anticipate or predict how that court would rule in the case.

4

Case No. 10-6077
*Atlantic Mutual Insurance Co. v. Michael Yates*

*Pennington*, 553 F.3d at 450. In making that prediction, we may look to the decisions of the intermediate Kentucky appellate courts "as persuasive unless it is shown that the state's highest court would decide the issue differently." *Id.* (citing *In re Dow Corning Corp.*, 419 F.3d 543, 549 (6th Cir. 2005)).

B.

1.

Nearly two decades ago, the Kentucky Supreme Court observed that appellate decisions on issues pertaining to stacking are "not written on a clean slate." *State Farm Mut. Auto. Ins. Co. v. Mattox*, 862 S.W.2d 325, 325 (Ky. 1993). Both before and after *Mattox*, Kentucky courts frequently have addressed stacking issues in a variety of contexts. *See Adkins v. Kentucky Nat'l Ins. Co.*, 220 S.W.3d 296 (Ky. App. 2007); *Cole v. State Auto Ins. Co.*, 19 S.W.3d 115 (Ky. App. 2000); *Marcum v. Rice*, 987 S.W.2d 789 (Ky. 1999); *Estate of Swartz v. Metro. Prop. & Cas. Co.*, 949 S.W.2d 72 (Ky. App. 1997); *Allstate Ins. Co. v. Dicke*, 862 S.W.2d 327 (Ky. 1993); *Hamilton v. Allstate Ins. Co.*, 789 S.W.2d 751 (Ky. 1990); *Ohio Cas. Ins. Co. v. Stanfield*, 581 S.W.2d 555 (Ky. 1979); *Meridian Mut. Ins. Co. v. Siddons*, 451 S.W.2d 831 (Ky. 1970). In fact, the decision in *Marcum* precipitated the change in the language of Atlantic's policy that gave rise to this dispute. Upon consideration of the Kentucky decisions on stacking of insurance coverage cited above, including decisions addressing uninsured and underinsured motorist coverage,[2] we conclude that the district

---

[2] In view of the Kentucky Court of Appeals statement that "there is no rational distinction between UM and UIM coverage for purposes of aggregation or stacking" (*Adkins*, 220 S.W.3d at 299), we will treat the two terms interchangeably in this opinion.

court acted well within the scope of its discretion in declining to certify any questions to the Kentucky Supreme Court. *See Transam. Ins. Co. v. Duro Bag Mfg. Co.*, 50 F.3d 370, 372 (6th Cir. 1995) ("The decision whether or not to utilize a certification procedure lies within the sound discretion of the district court"). Kentucky case law "provides sufficient guidance to allow us to make a clear and principled decision" such that certification of the stacking issue in the case is not necessary. *Pennington*, 553 F.3d at 450. We now turn to a discussion of the applicable legal principles.

When interpreting insurance contracts, the Kentucky Supreme Court has stressed that courts should look to the "reasonable expectations" of the insured. *Marcum*, 987 S.W.2d at 791. The Kentucky decisions have been equally clear that "reasonable expectations" must be viewed on the basis of "an objective analysis of separate policy items and the premiums charged for each," not on the subjective expectations of any specific insured based on what he or she knew, read, or expected. *Id*.; *see also Swartz*, 949 S.W.2d at 75. Under Kentucky law, "when one has bought and paid for an item of insurance coverage, he may reasonably expect it to be provided." *Marcum*, 987 S.W.2d at 791; *Dicke*, 862 S.W.2d at 329; *Hamilton*, 789 S.W.2d at 753. Conversely, "there is no entitlement to that which has not been bought and paid for nor should have been expected." *Marcum*, 987 S.W.2d at 792.

One unusual feature of UM (and UIM) coverage is that it is "personal" in nature. *See Hamilton*, 789 S.W.2d at 753. In other words, UM coverage differs from typical liability insurance because it "follows an insured person as opposed to any particular vehicle." *Pennington*, 553 F.3d at 451. Because the personal nature of UM coverage creates a "reasonable expectation that payment

6

of separate premiums results in separate coverages" (*Dicke*, 862 S.W.2d at 328), an insured generally is entitled to stack separate coverages and, in the event of a covered loss, collect money for each unit of UM coverage purchased. *See Chaffin v. Kentucky Farm Bureau Ins. Co.*, 789 S.W.2d 754, 756 (Ky. 1990).

Both *Marcum* and *Swartz* suggest that in assessing whether stacking should be permitted, the court must focus on how many items (or units) of UM coverage have been purchased by the insured. *Swartz* establishes that in undertaking this inquiry, the court should pay close attention to the actual relationship between premium paid and coverage extended lest the insurer offer a policy that purports to offer a single premium for all vehicles but in reality adds an additional premium for a second car. Thus, in *Swartz*, the court determined that where a company charged two separate rates – one for individuals with one vehicle and another for "individuals with two or more vehicles" – and the premium charged on a multi-vehicle policy was almost twice that charged on a single-vehicle policy, the insured had purchased two units of coverage and was entitled to stack those units. 949 S.W.2d at 76-78. At the same time, however, *Swartz* recognized, and the Kentucky Supreme Court in *Marcum* later reaffirmed, that "an insurance company could, through the calculation and adoption of an actuarially appropriate premium, charge an insured a single UIM fee *regardless of the number of vehicles covered under the policy*, entitling that insured to only one unit of UIM protection." *Marcum*, 987 S.W.2d at 791 (emphasis added) (quoting *Swartz*, 949 S.W.2d at 77).

Applying these legal principles to the policy at issue here, we look first to the "separate policy items and the premiums charged for each" (*Marcum*, 987 S.W.2d at 791) to determine how many units of coverage Yates had in force at the time of his accident. As noted above, the 2003 Plan

7

divided the total premium for various types of coverage between Yates' two vehicles, clearly indicating the amount assessed for each. Critically, as to UM coverage, the Plan terms directed the policyholder to a separate "Optional Coverages Page." On that page, the Plan stated that "[r]ates for UM or UM/UIM and added PIP are applied on a *per policy basis*. The *same rate applies regardless of the number of vehicles insured on this policy*." (Emphasis added.) That rate was $253.00 for $500,000 in UM coverage. Finally, the umbrella coverage under the Plan addressed UM/UIM coverage as follows: "We won't pay for Uninsured/Underinsured Motorists Coverage or No–Fault benefits unless such coverage is specifically shown on the Coverages Page as an Umbrella coverage." On Yates' policy, UM coverage was not listed on the "Coverages Page."

Turning back to the law, we find particularly helpful a juxtaposition of two cases in which Kentucky courts have undertaken a comprehensive examination of the principles motivating their stacking jurisprudence. In the more recent of those cases, decided by the Kentucky Supreme Court, the premium "did not vary according to the number of vehicles covered by the policy." *Marcum*, 987 S.W.2d at 791. Rather, a single fee was charged – $14 per person – and the insured paid that premium "regardless of the number of vehicles covered under the policy." *Id*. In those circumstances, the Kentucky Supreme Court held that the insured was entitled "to only one item of UIM coverage." *Id*.

In *Swartz*, by contrast, the premium paid by a customer with two vehicles was almost double the premium paid for one vehicle. 949 S.W.2d at 78. That observation prompted the intermediate Kentucky appellate court to find the insurance company's representation that it charged a single premium to be illusory. In reality, that single premium – $10 – applied only to "individuals with two

or more vehicles." *Id*. at 76. Anyone who had only one vehicle paid a lower rate – $6. *Id*. That structure, the court determined, was better characterized as charging "separate premiums in the guise of one premium" (*id*.) or, alternatively, as "combining the costs of several U.M. coverages and stating them as a single premium" (*id*. at 77 (quoting *Pride v. Gen. Agents Ins. Co.*, 697 F. Supp. 1417, 1421 (N.D. Miss. 1998)). The court also was troubled by the language of the policy, because it had the effect of "[l]eaving the insured uninformed by quoting a single premium and not explaining that the same UIM coverage in a single-vehicle policy would be 40% less," thereby undermining the company's obligation to give "the insured the full benefit of what he or she paid for." *Id*. at 78.

In our view, the facts of this case fall much closer to those presented in *Marcum* and are clearly distinguishable from the facts of *Swartz*. Atlantic Mutual charged a single rate for UM coverage ($253), which an insured paid for UM coverage regardless of how many drivers and how many vehicles were in the household. Yates and every other Atlantic Mutual customer paid exactly $253 for exactly $500,000 in UM coverage, whether the customer owned one, two, three, four, or any number of vehicles. And in the contractual offer made to the public through its insurance policy, Atlantic Mutual told its customers how much they would be charged for a particular amount of desired UM coverage, making clear that the fee would be imposed "on a per policy basis . . . regardless of the number of vehicles insured on this policy." In contrast to "the practice of effectively double-charging the insured for covering *both* drivers *and* vehicles," which "gave rise to stacking under the per-vehicle pricing structure" (*Pennington*, 553 F.3d at 453-54), the pricing structure under the 2003 Atlantic Mutual Plan charged Yates only once, regardless of the number

9

of drivers or vehicles covered under his policy. These facts convincingly indicate that Yates paid a single premium for a single item of coverage, and thus is not entitled to stacking under Kentucky law.

That conclusion also finds support in the post-*Marcum* decisions of the intermediate Kentucky appellate courts. In a 2007 decision, for example, the Kentucky Court of Appeals explained that "because *Marcum* resolves single premium UIM coverage in favor of the insurer . . . an insurer is not required to stack multiple units of UM coverage which have been paid by a single premium, if that premium is not based on the number of vehicles insured." *Adkins*, 220 S.W.3d at 299. In an earlier case, too, the Court of Appeals concluded that a premium structure whereby the policyholder "paid the same premium for her two cars as other policyholders paid for one, two, or more cars" was "policy-based" and did not permit the policyholder to claim that she had paid for multiple units of stackable UIM coverage. *Cole*, 19 S.W.3d at 116. As the court observed, such a premium structure "was of the type 'anticipated and condoned' in *Swartz*." *Id*.; *see also id*. (explaining that in *Swartz*, "stacking was permitted when what appeared to be 'policy-based' UIM coverage was in fact per-car coverage").

Our final issue as to stacking pertains to Yates' argument that, single premium or not, Atlantic Mutual cannot escape stacking because the premium that it charged in 2003 was not "actuarially appropriate" in any event. According to Yates, because Atlantic based its premium on revenues rather than an examination of risk, Atlantic did not comply with the requirements in *Swartz* for avoiding stacking. To analyze this argument, we must consider what Kentucky courts consider to be "actuarially appropriate" for the purpose of avoiding stacking. While no Kentucky decision

10

addresses that issue in great detail, the consistent thread in the case law distinguishes between "actuarial" premiums that are available on a per policy or per person basis (and not subject to stacking) and premiums "based on the number of vehicles insured" (that are subject to stacking). *See Adkins*, 220 S.W.3d at 300; *Marcum*, 987 S.W.2d at 790-91.

It is undisputed that in 2001, when Atlantic changed its premiums from per vehicle to per policy, it calculated the per policy premium to keep its revenues the same as when it used a per vehicle premium. To do this, Atlantic calculated the total revenue from all UM coverage by multiplying its per vehicle rate times the total number of vehicles insured with Atlantic. It then divided that number by its total number of policies with UM coverage, resulting in the $253.00 figure. As the district court observed, that methodology tracks closely the manner in which the insurance company in *Marcum* initially set its per policy rate at the time that it modified its rate structure to avoid stacking. *See Marcum*, 987 S.W.2d at 791. To be sure, that company shifted course at a later date, "using an actuarial projection of future losses that was based upon data from [its] loss experience for the previous three years." *Id*. But nothing in *Marcum* or any other Kentucky case suggests either that the first per policy rate structure adopted by the insurer in *Marcum* was not "actuarially appropriate" or that the second, revised rate structure was either preferred or mandated in order to avoid stacking. Nor do we read anything in the pertinent case law that directs courts to scrutinize the "actuarial appropriateness" of an insurer's rate structure at any level deeper than whether the insured pays "a single UIM fee regardless of the number of vehicles covered under the

11

policy." *Marcum*, 987 S.W.2d at 791 (quoting *Swartz*, 949 S.W.2d at 77) (emphasis omitted).[3]

While we are not unsympathetic to Yates' puzzlement at the fact that the change in Atlantic's rate structure meant that under the 2003 version of the Plan he paid more in premium for less UM coverage, that fact alone does not create any reasonable expectation of stacking. Again the central features of the policy for stacking analysis remain the "separate policy items and the premiums charged for each." *Marcum*, 987 S.W.2d at 791. The only basis for a reasonable expectation of stacking under Kentucky law is where the insured actually pays multiple premiums for separate items of UM coverage. Where, as here, the policy expressly provided that the coverage is constant regardless of the number of vehicles insured, there is a single premium for a single unit of coverage, and thus no reasonable expectation of stacking.

By way of illustration, we note that *Adkins* presented a similar factual scenario in that a change in the rate structure from "per vehicle" to "per policy" resulted in an objectively poorer deal for the insured, at least in regard to UM coverage in isolation. Under the original policy, issued in 1998, the insured paid on a per vehicle basis an annual rate of $32 for $50,000 of UM coverage, giving him total stacked coverage in the amount of $150,000 at a cost of $96 per year. 220 S.W.3d

---

[3] To the extent that Yates contends that Atlantic should have conducted a more rigorous risk assessment when it set new rates for UM coverage in 2001, we are not persuaded that any shortcomings in that process provide a basis for judicial intervention under the pertinent Kentucky cases. While Kentucky law permits courts to intervene in the relationship between insurance carrier and customer in some limited circumstances – for example, to allow stacking where rates are illusory (*see Swartz*, 949 S.W.2d at 76-78), or to reform the terms of an unconscionable insurance policy (*see, e.g.*, *Ryan v. Acuity*, 2012 WL 3047198, at *5 (Ky. App. July 27, 2012) – there is no rationale for doing so here because Atlantic structured its coverages and its rates in a legally permissible manner under *Marcum* and *Swartz*.

at 297. Prior to the 2001 renewal date for the policy, the insurer notified the policyholder of changes to the insurance contract, including a change in the UM coverage such that the policyholder would pay a single premium of $52 for a single unit of coverage in the amount of $50,000. *Id*. Although that change in premium and coverage did not result in the "pay more for less coverage" scenario in which Yates found himself, the policyholder in *Adkins* did experience a significant reduction in amount of coverage per dollar of premium charged after the company changed its policy to prevent stacking. Nevertheless, the Kentucky Court of Appeals concluded in *Adkins* that because the insurer charged a single premium that was "actuarial and not based on the number of vehicles insured," the insured had no reasonable expectation of aggregate or stacked UM coverage. *Id*. at 300.

Yates no doubt is correct that the combination of a higher premium and lower total coverage left him with a less attractive arrangement at least in regard to UM coverage.[4] But the new terms were spelled out in the 2003 Plan, which Yates indisputably received and presumably read before deciding to renew his coverage with Atlantic. As the court explained in *Adkins*, where policyholders receive notice of a change in their UM coverage, they are deemed to have "consented to the change by accepting the new policy and tendering the premiums." 220 S.W.3d at 299. The same is true

---

[4] It is conceivable – although not specifically addressed in the parties' briefs – that despite the less favorable terms for UM coverage under the 2003 Plan, the overall policy terms remained attractive to Yates taking into account all of the Plan's features. As Atlantic points out without contradiction from Yates, "having a single policy helped the Yates[es] avoid duplicate coverage and [they] received a package discount." Appellee Br. at 12 (citing RE. 39-11, Atlantic Master Plan, p. 1). The package discount undercuts Yates' attempt to analogize Atlantic's various coverages to "groceries thrown into a cart" (Reply Br. at 2-3), for grocery stores generally do not discount the customer's final bill based on the number or kinds of items purchased during a particular visit.

Case No. 10-6077
*Atlantic Mutual Insurance Co. v. Michael Yates*

here.[5]

It certainly appears to us, as it did to the district court, that after the 2003 rate restructuring,

Atlantic may well have "priced itself out of the market" for UM coverage. And if that is true, then

Atlantic may be forced to revise its rates if it wishes to remain competitive in the market for the UM

product. For example, it could follow the lead of the insurer in *Marcum*, which altered its premium

procedure by "using an actuarial projection of future losses that was based upon data from [its] loss

experience for the previous three years." 987 S.W.2d at 791. But even if we accept (as appears to

be the case) that Atlantic charged a high premium for UM coverage in 2003, it did so on a per policy

basis and made clear that it was offering a single unit of UM coverage at that price. In those

circumstances, stacking is not appropriate under Kentucky law.[6]

2.

The second issue presented in this appeal is whether additional UM coverage should be

imputed into the umbrella provision of Yates' policy. As with stacking, Kentucky law on the

imputation of UM coverage is sufficiently clear cut that we can proceed without certifying any

---

[5] We pause to note that although other insurers have provided more robust notice of changes in their rate structure (*see Adkins*, 220 S.W.2d at 298), the explanation given by Atlantic gave adequate notice to Yates by setting out the essential details – namely, that going forward the rates for UM coverage applied on a per policy basis regardless of the number of vehicles insured on the policy.

[6] Yates also raises an estoppel argument based on statements that Atlantic made to the Kentucky Insurance Commission to the effect that the 2001 premium change did not change the scope of its coverage. We agree with the district court that any consequences that may flow from those statements would be regulatory, not legal. Assuming that Atlantic made such statements, they do not factor into an "objective analysis of separate policy items and the premiums charged for each" under the Plan, and thus cannot be considered in assessing the "reasonable expectations of an insured." *Marcum*, 987 S.W.2d at 791.

questions to the Kentucky Supreme Court. *See Pennington*, 553 F.3d at 450-51.

As the district court correctly recognized, the imputation question arises because (1) on its face, the umbrella provision at issue does not provide UM coverage and (2) Yates acknowledges that he did not pay a premium for such coverage. Nevertheless, imputation of UM coverage may occur in some circumstances as a matter of Kentucky law. This follows from a Kentucky statute that requires all insurance policies to include at least minimum UM coverage in the amount of $25,000 unless the insurer has obtained a written rejection of such coverage from the policyholder. Ky. Rev. Stat. § 304.20-020. For purposes of that statute, an umbrella policy is considered an "automobile policy." *State Farm Mut. Auto Ins. Co. v. Marley*, 151 S.W.3d 33, 35-36 (Ky. 2004). As an exception to the general rule that coverage follows from the payment of premium, if an insurance policy does not include UM coverage and the insured did not reject it in writing, UM coverage in the minimum statutory amount will be imputed even if premium has not been paid for that specific coverage. *Meridian Mut. Ins. Co. v. Siddons*, 451 S.W.2d 831, 833-34 (Ky. 1970). In addition, under the statute, each policy is treated individually. Thus, even if an insured has UM coverage on one policy, coverage still will be imputed to any additional policy issued to that insured unless the insurer obtains a written waiver. *Id*. at 834.

In this instance, resolution of the imputation issue turns on whether the umbrella coverage provided by Atlantic to Yates was part of a single policy – one that already included automobile and UM coverage – or a separate policy. After consideration of the documentary record and the arguments of the parties, we agree with the district court that the "Plan" setting forth the terms of Yates' coverage is properly characterized as "a single, all-inclusive insurance policy." As the district

15

court observed, the Plan was created at one time, all coverages were explained in a single document, and Atlantic billed the Plan as a single policy. On the "declarations" page of the Plan that explains coverages and premiums, the description of UM coverage is on the same page as the description of the umbrella coverage. In addition, the charges for the Plan are listed as the "Total Policy Charge," and when that total charge is broken down, the various components (property, automotive, UM, and umbrella) are listed as "coverages," not policies. Finally, as noted above, Atlantic asserts – and Yates does not dispute – that Yates received a package discount. All of these circumstances support the conclusion that Yates purchased a single insurance policy that contained multiple coverages. That Atlantic advertises and offers umbrella coverage as a separate policy does not alter our conclusion. To the extent that a customer wishes to purchase standalone umbrella coverage from Atlantic, the customer pays the premium for that coverage alone. If that customer does not decline UM coverage in a written waiver, he or she is entitled to the imputation of $25,000 in UM coverage by operation of state law. But that is not our case. Here, Yates purchased the Plan, which included multiple coverages set out in a single policy with a single premium. That policy already included $500,000 in UM coverage – 20 times the statutory minimum – and the umbrella provision did not list UM (or UIM) coverage on the "Coverages Page." To impute UM coverage under these circumstances would directly contradict the proposition that "[w]hile one is entitled to receive that which has been bought and paid for and may be reasonably expected, there is no entitlement to that which has not been bought and paid for nor should have been expected." *Marcum*, 987 S.W.2d at 792. Finally, we agree with the district court that because (1) Yates had no reasonable expectation of UM coverage under the umbrella provision of his policy and (2) his policy taken as a whole

provided twenty times the minimum UM coverage required by Ky. Rev. Stat. § 304.20-020, there is no public policy reason to impute UM protection into the umbrella provision of the Plan.[7]

In sum, we affirm the judgment of the district court. Applying Kentucky law to the terms of the insurance coverage that Yates purchased and the premiums that he paid, we agree with the district court that Yates was not entitled to more than one unit of UM coverage, nor was he entitled to imputation of additional UM coverage under the umbrella provision of his policy.

---

[7] Because we conclude that Atlantic offered – and Yates accepted – $500,000 in UM coverage among the many coverages encompassed in the policy at issue, there was no need for Atlantic to have obtained from Yates the waiver referenced in Ky. Rev. Stat. § 304.20-020.

**CLAY, Circuit Judge, concurring in part and dissenting in part.** I concur with the majority opinion's conclusion that the stacking of Defendant's uninsured/underinsured motorist ("UM/UIM") coverage is inappropriate. I also agree that we have no need to certify the questions on appeal to the Kentucky Supreme Court. But on the question of whether UM/UIM coverage should be imputed to Defendant's umbrella policy, my reading of Kentucky law and application to the facts of this case require me to part ways with the majority's approach.

There is an air of reflexiveness to the district court's analysis of the Master Plan, and while the majority's opinion is anything but reflexive, I believe that the majority has given short shrift to the oft-repeated, "fundamental" rule of Kentucky insurance law that insurance contracts "should be liberally construed and any doubts resolved in favor of the insured." *Dowell v. Safe Auto Ins. Co.*, 208 S.W.3d 872, 877–78 (Ky. 2006) (quoting *Davis v. Am. States Ins. Co.*, 562 S.W.2d 653, 655 (Ky. Ct. App. 1977)); *see, e.g.*, *Ky. Farm Bureau Mut. Ins. Co. v. McKinney*, 831 S.W.2d 164, 166 (Ky. 1992); *Yates v. Shelter Mut. Ins. Co.*, No. 2010-CA-000022-MR, 2011 WL 3628866, at *1 (Ky. Ct. App. Aug. 19, 2011). It is ambiguous whether the Master Plan is a single policy with multiple components or multiple policies sold together for practical reasons. Under Kentucky law, that ambiguity resolves this issue. Therefore, I respectfully dissent.

## I.      Legal Framework

As the majority opinion explains, Defendant bought a $1,000,000 umbrella policy when he purchased the "Atlantic Master Plan Policy" ("Master Plan"), and he contends that the umbrella policy is a stand-alone unit to which the UM/UIM coverage requirement in Kentucky Revised Statutes (KRS) § 304.20-020(1) must be applied. If the Master Plan is a single policy, then the

Case No. 10-6077
*Atlantic Mutual Insurance Co. v. Michael Yates*

UM/UIM coverage Defendant bought under the Master Plan satisfies § 304.020(1)'s requirement that every automobile insurance policy be accompanied by UM/UIM coverage. By contrast, if the Master Plan is a bundle of free-standing policies sold together for practical purposes, then the umbrella policy is free-standing and UM/UIM coverage must be imputed to it. My disagreement with the majority opinion regards its conclusion that the Master Plan was indisputably a single policy, from which the majority concludes that UM/UIM coverage need not be imputed to Defendant's umbrella policy. In my view, a close examination of both Kentucky law and the Master Plan demonstrates that the majority's characterization of the Master Plan as a single policy is far from clear. And Kentucky law requires that this lack of clarity weigh against the insurer.

As the majority points out, KRS § 304.20-020(1) prohibits an automobile insurance policy from being issued without UM coverage or a written waiver of said coverage.[1] KRS § 304.20-020(1); *see Meridian Mut. Ins. Co. v. Siddons*, 451 S.W.2d 831, 833 (Ky. 1970). Pursuant to § 304.20-020(1), if an automobile liability policy does not contain UM coverage or is not

---

[1]Section 304.20-020(1) states in full: "No automobile liability or motor vehicle liability policy of insurance insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless coverage is provided therein or supplemental thereto, in limits for bodily injury or death set forth in KRS 304.39-110 under provisions approved by the commissioner, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death, resulting therefrom; provided that the named insured shall have the right to reject in writing such coverage; and provided further that, unless the named insured requests such coverage in writing, such coverage need not be provided in or supplemental to a renewal policy where the named insured had rejected the coverage in connection with a policy previously issued to him or her by the same insurer."

accompanied by a written waiver, then Kentucky courts reform the policy and impute UM coverage into the policy. *Id.* An umbrella policy is an "automobile policy" for purposes of § 304.20-020(1). *State Farm Mut. Auto. Ins. Co. v. Marley*, 151 S.W.3d 33, 36 (Ky. 2004) ("An umbrella policy was purchased to serve as an extension of the automobile policy limits and any distinction between the automobile liability and an umbrella liability policy is a distinction without a difference.").

The majority gives too little weight to the rules governing Kentucky insurance contracts that require the insurance company, and not the insured, to bear the loss of any ambiguity in the contract. Under the "reasonable expectations" doctrine, an insured is entitled to recover when, analyzed objectively, the insured "bought and paid for an item of insurance coverage" and "may reasonably expect it to be provided." *Marcum v. Rice*, 987 S.W.2d 789, 791 (Ky. 1999); *see Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 565 (6th Cir. 2008). As adhesion contracts, Kentucky courts liberally construe insurance contracts in favor of coverage. *Yates*, 2011 WL 3628866, at *1; *State Farm Mut. Auto. Ins. v. Slusher*, 325 S.W.3d 318, 322 (Ky. 2010). The insurance company is held "strictly accountable" for the contract language when the company drafts the contract, as it did here. *St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward, Inc.*, 870 S.W.2d 223, 227 (Ky. 1994). To be sure, the Kentucky courts caution that "a liberal interpretation is not synonymous with a strained one" and, therefore, that "[i]nsurance policies, like statutes, must receive a sensible construction." *K.M.R. v. Foremost Ins. Grp.*, 171 S.W.3d 751, 753 (Ky. Ct. App. 2005); *Simpsonville Wrecker Serv. Inc. v. Empire Fire & Marine Ins. Co.*, 793 S.W.2d 825, 829 (Ky. Ct. App. 1989)). But any conflict in the contract's provisions is "resolved to afford maximum coverage." *St. Paul Fire & Marine Ins. Co.*, 870 S.W.2d at 226.

**II.     Analysis**

The Master Plan equivocates about whether it is a bundle of independent policies or a single policy with many coverage components.  The Master Plan's documents refer to the underlying coverage units as separate policies on several occasions.  For example, in explaining the scope of the umbrella coverage, the policy documents referring to Defendant's umbrella coverage state that:

> [t]his coverage is over and above your other insurance.  On your Coverages Page, you'll find a Schedule of Underlying Insurance that describes your other liability *policies*.  Any *policy* named on that schedule is considered "underlying insurance."

As another example, the Master Plan's rules and regulations pertaining to umbrella coverage limit the liability insurance for "[t]his policy" to $1,000,000, and the rules refer to required underlying coverages as "primary policies."  The rules also set the price of $1,000,000 in umbrella coverage at a $120 "Rate per Policy."

The description of the Master Plan given by Christopher Donahue, Assistant Vice President of Portfolio Management for Plaintiff, supports the conclusion that the underlying Master Plan coverages were independent policies.  His deposition makes it clear that an insured had discretion as to whether to purchase the umbrella policy as part of the Master Plan and that doing so would increase the Master Plan's cost.  Indeed, whether or not Donahue uses the term "policy," his deposition supports the proposition that each component part of the Master Plan was treated as a separate insurance unit which the insured had discretion to purchase.  As he explained, the Master Plan could be tailored through endorsement, thus allowing the insured to decide which coverages he preferred to buy.  Additionally, Donahue testified that Plaintiff writes umbrella policies for insured persons who have underlying policies with other insurance companies.  In those situations,

Plaintiff provides the same umbrella policy and uses the same "Personal Umbrella Endorsement Form" to execute the policy. The malleable nature of the Master Plan's components, and the insured's ability to buy some coverages and not buy others, supports the conclusion that each underlying coverage stands alone as its own policy.

To be sure, at times the Master Plan refers to itself as a single policy and the underlying coverage units as coverage components. The policy documents state that the "Master Plan is designed to meet most of your personal insurance needs under one *policy*." The Master Plan is memorialized in a 29-page document divided into four parts, respectively entitled "Important Information about your Atlantic Master Plan" (Part I), "Your property coverage" (Part II), "Your liability coverage" (Part III), and "Terms and conditions" (Part IV). Under "Your liability coverage" (Part III), the Master Plan includes provisions entitled "Uninsured/Underinsured motorists' coverage" and "Personal umbrella coverage." Atlantic charged a single premium for the Master Plan. The Master Plan also guarantees payment for any interest accrued on a judgment against the insured covered "by this policy," plainly referring to the entire Master Plan. These portions of the policy suggest that it is a single policy with multiple coverage components.[2]

---

[2]The majority considers the failure of the "Coverages Page" appended to the Master Plan to mention UM/UIM coverage as evidence that UM/UIM coverage should not be imputed to Defendant's umbrella policy. This argument overlooks *Meridian Mutual Insurance Company v. Siddons*, in which the Kentucky Supreme Court interpreted a policy that included a provision limiting UM the coverage to the amount agreed upon in the UM coverage that the insured purchased. *Siddons*, 451 S.W.2d at 834. The court concluded that the provision violated public policy because the state legislature, in a predecessor statute to § 304.20-020(1), required the parties to execute a written waiver in order for an automobile policy not to provide for UM/UIM coverage. Indeed, any result other than the one reached in *Siddons* would eviscerate § 304.20-020(1) by allowing the insurer to simply disclaim coverage instead of obtaining a written waiver as the statute requires. Considering

22

We need not decide which characterization of the Master Plan is more appropriate. Simply recognizing that a reasonable person could characterize the Master Plan as a bundle of multiple free-standing policies or a single policy resolves this case. *Marcum*, 987 S.W.2d at 791. The Georgia Court of Appeals concluded that the Master Plan was a bundle of independent policies in a case similar to this one. *See Abrohams v. Atlantic Mutual Insurance Agency*, 638 S.E.2d 330 (Ga. Ct. App. 2007). In *Abrohams*, the parents of a child injured in an automobile collision purchased a policy from Atlantic Mutual identical to the one Defendant purchased. *Id.* at 331. The parents recovered from Atlantic Mutual in the amount provided by the UM coverage accompanying their automobile policy, but the recovery fell short of the suffered loss. *Id.* Like Kentucky, Georgia law requires an automobile policy to carry UM coverage unless the insured waives the coverage in writing. *See* Ga. Code (OCGA) § 33-7-11.

The Georgia Court of Appeals agreed with the parents. Addressing "the narrow issue of whether an umbrella policy is subject to the requirements of OCGA § 33-7-11," the court answered in the affirmative. *Id.* at 332. The court noted that the Georgia statute defining "vehicle insurance" did not exclude umbrella policies from its scope. *Id.* at 332 (quoting OCGA § 33-7-9). The court also reasoned that § 33-7-11 allowed no exceptions from the UM requirement and that the UM statute was "remedial in nature and must be broadly construed to accomplish the legislative purpose." *Id.* at 332–33 (internal citations and quotations omitted). Largely on the basis of the latter two rules, the Georgia Court of Appeals concluded that § 33-7-11 applied to the umbrella policy and

the absence of UM/UIM coverage on the Master Plan's "Coverages Page," as the majority does, similarly weakens the effect of the statute.

that the parents were entitled to UM coverage from the policy. *Id.* That court considered it so obvious that the Master Plan was a bundle of independent policies that it proceeded upon that conclusion without even considering the issue at length. *See id.* at 331 (explaining that plaintiffs were in insured "under an Atlantic Mutual insurance policy comprised of a homeowners *policy*, an automobile *policy*, a valuables *policy*, and a personal umbrella *policy*." (emphasis added)). Of course, we are not bound by the Georgia Court of Appeals' conclusion, but the fact that a panel of judges on another court facing the same issue considered it so clear that the Master Plan is a bundle of independent policies demonstrates a disagreement that reasonable people could have on this issue.

Under Kentucky law, that disagreement requires us to construe the Master Plan in favor of coverage. *Slusher*, 325 S.W.3d at 322. In the face of an ambiguity like the characterization of the Master Plan, Kentucky law instructs that "[o]nly an unequivocally conspicuous, plain and clear manifestation of the company's intent to exclude coverage will defeat" an insured's reasonable expectation of coverage. *Brown v. Ind. Ins. Co.*, 184 S.W.3d 528, 540 (Ky. 2005). Section 304.20-020(1) provides a mechanism for the insurer to make "an unequivocally conspicuous, plain and clear manifestation" to disclaim UM/UIM coverage for the Master Plan's umbrella policy in the form of a written waiver in which the insured rejects coverage. It was incumbent on Plaintiff to require Defendant to sign such a waiver when he bought the Master Plan. Plaintiff failed to do so. In my view, Kentucky law requires Plaintiff to suffer the consequence of that failure.